(No. 69277.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. HARRY L. GOSIER, Appellant.

*Opinion filed September 19, 1991.—Rehearing denied December 2, 1991.*

Charles M. Schiedel, Deputy Defender, and Peter L. Rotskoff, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Roland W. Burris, Attorney General, of Springfield (Terence M. Madsen and Bradley P. Halloran, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE MORAN delivered the opinion of the court:

Defendant, Harry Gosier, was charged with committing two separate murders and two separate aggravated criminal sexual assaults, in Champaign County. During his trial, the defendant pled guilty to all the charges. Following his guilty pleas, the trial court found that the

defendant was eligible for the death penalty. Subsequently, the jury that had originally been impaneled to determine guilt found that there were no mitigating factors sufficient to preclude the imposition of the death sentence. The trial court then sentenced the defendant to death for the murders, and to consecutive 60-year sentences for the two counts of aggravated criminal sexual assault. The death sentence was stayed (134 Ill. 2d R. 609(a)), pending direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d R. 603).

Concerning his guilty plea, the defendant raises as issues whether: (1) his plea violated the constitution because he was never admonished that he could plead guilty but mentally ill; (2) the trial court properly denied his request to withdraw his guilty plea, and substitute a plea of guilty but mentally ill; and (3) the trial court properly denied his post-trial motion to withdraw his guilty plea.

Concerning his sentencing hearing, the defendant raises as issues whether: (1) the death sentence was properly imposed; (2) he was denied a fair sentencing hearing when the trial judge admitted out-of-court statements made by defendant's three-year-old daughter; (3) the trial judge's questioning of a mitigation witness was proper; (4) he was denied a fair sentencing hearing because of the prosecutor's improper closing argument; (5) the sentencing jury had jurisdiction to sentence him to death; (6) the trial court properly denied his motion for a continuance prior to the second stage of the death penalty hearing; (7) the jury should have been specifically instructed to consider his guilty plea as a mitigating factor at sentencing; (8) the trial court properly refused to modify the verdict form, and instruct the jury that the only alternative to death was a life sentence without possibility of parole; (9) the jury instructions, taken as a whole, precluded the jury from considering mercy within

all the factors in aggravation and mitigation; (10) he was denied his right of allocution; and (11) the trial court properly refused his request to limit the State to one closing argument.

The defendant additionally claims that the Illinois death penalty statute is unconstitutional.

The defendant was charged, in a Champaign County grand jury indictment, with the murders of his mother-in-law, Mae Halcrombe (Mae), and his sister-in-law, Soynda Halcrombe (Soynda). He was also charged with sexually assaulting Soynda and his estranged wife, Lesia Halcrombe Gosier (Lesia).

Prior to trial, the defendant requested to proceed *pro se*, and the trial court granted his request. Defendant later made a request that counsel be reappointed, which the trial court granted. Thirteen days before the trial began, the defendant again requested that the trial court dismiss his attorney and allow him to proceed *pro se*. After questioning and admonishing the defendant, the trial court granted this request, but asked that the public defender, Joseph Hooker, assist the defendant as backup counsel.

A jury trial then began as scheduled. The State's fourth witness was to be defendant's wife, Lesia. Immediately before Lesia's testimony was to commence, a recess was taken because the defendant appeared to be "emotionally upset seated at counsel table, visibly and audibly crying." When trial reconvened, Lesia was also emotionally upset and unable to compose herself. While she attempted to regain her composure, the defendant informed one of the deputies that he wished to plead guilty to all the charges. The jury was removed from the courtroom and the defendant told the trial judge: "Your Honor, can't none of us undue the past. And I still love my family and I'm guilty Your Honor. I'm guilty." The

trial court admonished the defendant concerning the consequences of a guilty plea, and then accepted his plea.

Following the entry of defendant's guilty plea, a death sentence hearing commenced. The defendant requested, and received, counsel to represent him throughout the remainder of the proceedings. The first stage of the sentencing hearing was held before the trial judge alone. At this stage, the judge found the defendant eligible for the death penalty because of the presence of the following aggravating factors: (1) the defendant committed more than one murder; and (2) the murders were committed during the course of an aggravated criminal sexual assault.

The first witness called at the second stage of defendant's death penalty hearing was his estranged wife, Lesia, who testified as follows: that she was the defendant's wife, but was currently separated from him; that she had filed for a divorce because of marital problems that she and the defendant were having; that prior to, and after, the filing of the divorce papers, the defendant repeatedly contacted her and asked for a reconciliation, or alternatively, made threats against her and her family; and that she told the defendant that it was too late for a reconciliation, and obtained a restraining order prohibiting him from contacting, or coming near, either her or their daughter, India.

Lesia also testified: that on the day of the offenses, she and India were living at her parents' home in Champaign; that she arrived at the house in the early afternoon to have lunch with her sister, Soynda; that, after walking in the front door, she noticed that the garage door looked like it had been "broken into," and that she called out for Soynda; that the defendant then approached her, holding a handgun (he also had a knife and a barbecue fork sticking out of his pants); that, as he approached her he was yelling "March 2nd," the date set

for their divorce proceedings; that the defendant was drinking a beer and told her that she did not "stand up for him with her family"; that there was blood on the defendant's clothes, and he told her that he had already killed Soynda; that he also told her that he had been watching the house, and knew when the various family members should arrive home; that the defendant then took her into her bedroom, and had India leave the room, at which point he forced her, at gunpoint, to have intercourse with him; and that after the defendant finished, he got dressed and tied her up with an extension cord, and gagged her with a pillow case.

Lesia further testified: that the defendant was upset that everyone was late getting home and repeatedly told her that he would "blow her head off"; that the defendant saw a car drive up, and he left her in the bedroom; that she then heard her mother, Mae, enter the house, encounter the defendant, and talk with him as they moved around the house; that she then heard three gunshots and a fall to the ground; that the defendant then came back into the room, pointing a rifle at her; that she had loosened the cord around her hands and began to struggle with the defendant; and that, during the struggle, the defendant hit her on the head and she lost consciousness, regaining it only after the police arrived.

Porter Halcrombe, husband of Mae and father of Lesia and Soynda, testified in aggravation as follows: that, the evening before the offenses, the defendant called and asked him to send Lesia and India home; that he told the defendant that the decision was up to Lesia; that the defendant also asked if he would be going to work in the morning, and he answered that he would; and that when he arrived home on the day of the offenses, he found his wife Mae's body in their bedroom.

Dr. Stanley Babowski, a pathologist at Burnham Hospital in Champaign, testified as follows: that he per-

formed autopsies on both Soynda and Mae; that Soynda had abrasions about her body, and that the cause of her death was a gunshot wound to the head; that the results of vaginal examination revealed the presence of viable sperm; and that an autopsy of Mae revealed that she died as a result of any of three gunshot wounds to her head.

Ethel Mae Tillman, the mother of defendant's first wife, Linda, testified as follows: that the defendant and Linda had marital difficulties, beginning shortly after their marriage in 1983; that, within a year of their marriage, defendant threatened Linda with a knife; that shortly thereafter, Linda and Terrenie (the couple's only child) moved out of the marital abode in Champaign, and moved in with Ethel in Florida; that the defendant then moved into her house, to live with Linda and Terrenie; that, over the next few years, defendant moved in and out of her house; that the defendant engaged in a number of violent episodes, including breaking out some windows with his fist and with a chair; and that the marriage between the defendant and Linda ended in divorce, with Linda receiving custody of Terrenie.

Tracy Jobe, an investigator with the Champaign police department, testified that she interviewed the defendant's daughter, India, a few days after the offenses occurred. Over the defendant's objections, Jobe testified that, during the interview, India told her that she saw her father hurt her grandmother by shooting her in the head.

Police Detective Alan Atterberry testified that he interviewed the defendant on the day after the offenses. He stated that the defendant initially denied his involvement in the crimes, but eventually admitted that he "did everything except *** [that he] didn't do no shooting."

Norman Cooper, a bus driver with the Champaign-Urbana mass transit, testified that the defendant

boarded his bus around 6 p.m. on the day of the offenses. He also stated that the defendant did not appear to be upset and had a normal demeanor.

Various jail officers testified that while the defendant was held in custody: he threatened to kill a jail guard; he fought with jail guards; he bit jail guards; he threatened to commit suicide; and he kicked out the window of a prison transport van. Two of the officers also stated that the defendant had written them letters of apology for the incidents.

The first witness in mitigation was the defendant's high school teacher and football coach, Ron Shepard. He testified that the defendant was an outstanding athlete and captain of the football team, never missed practice, and was well liked and respected by everyone at the high school.

Psychiatrist Dr. Emanual Tanay testified in mitigation as follows: in his opinion, the defendant was not insane at the time he committed the offenses; the defendant did, and continues to, suffer from a personality disorder which was compounded by his conflicts with his wife and his dependence on drugs; at the time of offenses, the defendant was under a severe emotional disturbance; that the defendant's father was killed when the defendant was very young, and that, at the age of two, his mother placed him in a foster home, leading to defendant's feeling, as a child, that he was unwanted and unloved; that, because the defendant was a star high school athlete, he was overindulged as an adolescent, which, when combined with his earlier feelings that he was unloved, is the worst combination possible; and, because the defendant's actions derived from family difficulties, it was unlikely that the defendant would repeat such actions in a prison setting.

Ronald Rickard, an attorney from Imlay City, Michigan, and a friend of the defendant, testified as follows:

that he and the defendant became friends when the defendant attended the University of Michigan; that, after the defendant left Michigan (to raise his grades at a junior college in California, and thereafter transfer to the University of Illinois), he and the defendant remained friends, regularly speaking to each other on the phone; and that defendant had been to his home on many occasions, and was always a gentleman. On cross-examination, Rickard testified that, when the defendant was a student at the University of Michigan, he was arrested and charged with assaulting a police officer, and was thereafter placed on probation.

Various high school teachers and acquaintances of the defendant testified that he was well liked, respected, president of the high school's student government, helpful, generous with his time, and a substitute teacher at his former school after he graduated.

John Roberts, manager of a White Hen Pantry in Champaign and the defendant's former employer, testified that, on the morning of the offenses, he saw the defendant, who appeared to him to be "higher than a kite." On cross-examination, Roberts testified that, when he asked the defendant how he was getting along with his wife and father-in-law, the defendant said he was going to "take care of that" situation later that day.

Raymond Winfrey, a minister at the Champaign County correctional center, testified that during one of the services, the defendant openly admitted committing the offenses, and said he was sorry for what he had done. Kenneth Barnes, a prisoner incarcerated in the same cell block as the defendant at the Champaign County correctional facility, testified that another prisoner at the jail had planted a shank in the defendant's cell, and then later told guards that the defendant had a shank in his cell. Barnes further testified that, when he

told guards that he and the defendant planned to attempt an escape, he had been lying.

Kathleen Gosier, the defendant's sister, testified that the defendant was very upset in late 1987 (the offenses occurred in early 1988) over his wife's decision to have an abortion. Sandra Smith testified that she had known the defendant most of his life, and that he got along well with her children and had sent her money when she was having financial difficulties.

In his own defense, the defendant admitted that he committed the offenses, but that he had trouble remembering precisely what had occurred that day, because of his drug abuse and emotional distress. He also stated that, on the day of the crimes, he had smoked cocaine and drank alcohol prior to breaking into the Halcrombe's home. He further stated that he was unarmed when he got to the house, but that he found a handgun in Porter Halcrombe's bedroom.

Following closing arguments, the jury found that there were no mitigating factors sufficient to preclude imposition of the death sentence. The trial court then sentenced the defendant to death for the murders, and to two consecutive 60-year sentences for the two counts of aggravated criminal sexual assault.

Following sentencing, the defendant moved to withdraw his guilty plea. He included within his motion an affidavit from Dr. Tanay, in which he stated that the defendant was mentally ill at the time of the offenses. The trial court denied the defendant's motion. The death sentence was stayed (134 Ill. 2d R. 609) and the defendant directly appeals to this court (134 Ill. 2d R. 603(a)).

## THE GUILTY PLEA

The first issue that the defendant raises for review is that his guilty plea was not knowing and voluntary under *Boykin v. Alabama* (1969), 395 U.S. 238, 23 L. Ed.

2d 274, 89 S. Ct. 1709. He argues that because the trial court failed to admonish him that he could plead guilty but mentally ill (GBMI), his plea was not knowingly and voluntarily made. Under Illinois law, a court may make an alternative finding of GBMI where a defendant has unsuccessfully presented a defense of insanity. The relevant statutory provisions state:

"After a plea or verdict of guilty but mentally ill *** [t]he court may impose any sentence upon the defendant which could be imposed pursuant to law upon a defendant who had been convicted of the same offense without a finding of mental illness." (Ill. Rev. Stat. 1987, ch. 38, par. 1005—2—6(a).)

" '[M]ental illness' or 'mentally ill' means a substantial disorder of thought, mood, or behavior which afflicted a person at the time of the commission of the offense and which impaired that person's judgment, but not to the extent that he is unable to appreciate the wrongfulness of his behavior or is unable to conform his conduct to the requirements of law." (Ill. Rev. Stat. 1987, ch. 38, par. 6—2(d).)

"When the defendant has asserted a defense of insanity, the court may find the defendant guilty but mentally ill if, after hearing all of the evidence, the court finds beyond a reasonable doubt that the defendant:

(1) is guilty of the offense charged; and

(2) was mentally ill at the time of the commission of the offense; and

(3) was not legally insane at the time of the commission of the offense." Ill. Rev. Stat. 1987, ch. 38, par. 115—3(c).

The State initially claims that the defendant has waived this argument because neither the defendant (acting *pro se*) nor his appointed counsel ever objected to the trial court's allowance of his guilty plea. Notably, immediately following the defendant's guilty plea and the reappointment of counsel the trial judge asked if there was any reason why he should not take judicial notice of

the guilty plea at the sentencing hearing and defense counsel raised no objections at that time. If the admonishments were improper, the law of waiver does not apply because the defendant could not have made a knowing and intelligent waiver of his constitutional rights. (*People v. Weakley* (1970), 45 Ill. 2d 549, 552; *People v. Evans* (1967), 37 Ill. 2d 27, 32.) Therefore, it is necessary for us to determine whether the defendant was properly admonished.

As noted above, section 115—3(c) of the Code of Criminal Procedure of 1963 requires that a defendant raise the issue of insanity in order to be eligible for a GBMI conviction. (Ill. Rev. Stat. 1987, ch. 38, par. 115—3(c); see also *People v. Halstead* (1987), 164 Ill. App. 3d 1, 10-11.) Although the defendant briefly mentioned that he intended to raise the insanity defense at a pretrial hearing, he did not properly assert it in the form of a pretrial motion. Furthermore, a review of the defendant's opening statement indicates that he planned to deny that he committed any of the charged offenses, and not that he planned on alleging the affirmative defense of insanity. Because the defendant failed to properly raise the insanity defense, the trial court did not err in its failure to admonish the defendant that he could plead GBMI. We further find that the admonishment that the trial court gave to the defendant fully complied with the relevant law. See 134 Ill. 2d R. 402; *Boykin*, 395 U.S. at 243-44, 23 L. Ed. 2d at 279-80, 89 S. Ct. at 1712.

The defendant next argues that he should be allowed to substitute a plea of GBMI in place of his guilty plea, and that the trial court should be directed to conduct a hearing, pursuant to section 115—2 of the Code of Criminal Procedure (Ill. Rev. Stat. 1987, ch. 38, par. 115—2) on such a plea. He further argues that the trial court abused its discretion in denying his post-trial motion to withdraw his guilty plea and substitute a GBMI plea.

The provisions of section 115—2 are only applicable before and during, but not after, a trial. Additionally, the trial court has discretion in deciding whether to allow a defendant to withdraw a guilty plea, and enter a substitute plea. (134 Ill. 2d R. 604(d); *People v. Walker* (1985), 109 Ill. 2d 484, 501-02.) The defendant argues that, in the instant case, the trial court abused its discretion. The defendant's assertion is based primarily upon Dr. Tanay's affidavit (submitted contemporaneously with his post-trial motion). In his affidavit, Dr. Tanay stated:

> "Had I been asked at the time of trial if in my opinion Mr. Gosier [the defendant] suffered from mental illness at the time of the commission of the crime, my response would have been affirmative. I have familiarized myself with the Illinois definition of mental illness ***."

As the State properly notes, this observation by Dr. Tanay is inconsequential because the results of the doctor's examination were properly before the trial judge when he accepted the defendant's guilty plea, and presumably, the trial judge was aware of the definition of mental illness, under Illinois law. Defendant's reliance on *People v. Allen* (1984), 101 Ill. 2d 24, is misplaced. In *Allen*, this court reversed a defendant's guilty plea and death sentence arising out of a double-murder conviction, even though the trial court's admonishments were satisfactory. *Allen* can be distinguished from this case because, in *Allen*, evidence was submitted that the defendant suffered from organic brain damage, and further research would reveal that he was insane at the time he committed the crimes. In the instant case, the issue is whether the the defendant could be found (or could plead) GBMI. The defendant does not argue that he could be found to have been legally insane at the time of the offenses. Therefore, we find that the trial court did not abuse its discretion in denying the defendant's motion to substitute his guilty plea with a plea of GBMI.

Regarding his guilty plea, the defendant also argues that his guilty plea was not knowing, intelligent, or voluntary, where he was under the impression that by pleading guilty there was a possibility that he could receive a sentence of something less than natural life imprisonment. He also argues that he was physically and emotionally unstable at the time of his plea.

At the hearing on the defendant's post-trial motion to withdraw his guilty plea, the defendant testified as follows: that despite the trial court's admonishments concerning the two sentencing alternatives, he believed that, if he pled guilty, he could receive a prison sentence of less than natural life; that his standby counsel told him that any sentence he received could be appealed; and that he understood that to mean that a reviewing court could reduce his sentence to something less than natural life.

Joseph Hooker, the defendant's stand-by counsel, testified at the post-trial hearing that he may have mentioned possible factual scenarios where the defendant could receive a sentence of less than natural life. However, he said that he told the defendant that the minimum sentence upon conviction of two murders is natural life.

The trial court properly admonished the defendant prior to accepting his guilty plea. Specifically, with regards to sentencing, the trial court stated:

"[I]f I accept your offer to plead guilty to the 2 First Degree Murder charges here, involving 2 different victims, Soynda Halcrombe and Mae Halcrombe, upon my doing so, if you were not sentenced to death, I would be required to impose a sentence of natural life imprisonment, which as I have explained to you in the past means literally that you would be sentenced to prison for the rest of your life and you would be in prison for the rest of your life with no possibility of parole or being released from prison except upon one of two things happening. Ei-

ther gubernatorial pardon or commutation. As I have also explained to you, while those are technically possible, for all practical purposes, they never happen. And you should understand that the imposition of a sentence of natural life imprisonment, would mean just that. That you'd be spending the rest of your life in prison somewhere in the State of Illinois, if you were not sentenced to the death penalty.

Do you understand that, sir?

[The defendant]: Yes I do, your Honor."

Additionally, a complete review of the record shows that the trial court admonished the defendant concerning the possible sentence of natural life imprisonment numerous times prior to the acceptance of the defendant's guilty plea. The trial court also made a finding that the defendant was of sound mind at the time of the plea and not emotionally unstable.

The trial court found that the defendant's assumption that he could receive a sentence of something less than natural life if he pled guilty was totally groundless. Furthermore, a review of the trial court's admonishments to the defendant show that they far exceeded the requirements of Supreme Court Rule 402 (134 Ill. 2d R. 402). We feel the trial court thoroughly and properly admonished the defendant prior to accepting his guilty plea.

The defendant further argues that even though Joseph Hooker was his stand-by counsel, any erroneous or misleading advice that Hooker gave him renders his guilty plea invalid. Regardless of whether stand-by defense counsel is technically "counsel" in terms of liability for giving a defendant improper advice, there was no evidence in the record that Hooker made any improper or misleading representations. Additionally, a review of the record, and the conduct of the trial judge in this case, leads us to believe that the defendant had a complete understanding that, if he pled guilty to the offenses, the

minimum prison sentence he could receive would be natural life.

## SENTENCING

Concerning defendant's sentencing hearing, we initially consider whether the sentence of death is an appropriate sentence in light of the circumstances of the crime, and the character of the accused. The defendant argues that the circumstances of this case "do not bespeak a man with a malignant heart who must be permanently eliminated from society." (*People v. Carlson* (1980), 79 Ill. 2d 564, 590.) He further states that, unlike most cases where the death penalty is imposed, the tragic crimes in this case arose not from a criminal enterprise, but rather from an escalating domestic dispute. Thus, he argues that we should follow other cases where such circumstances led to this court finding death to be an inappropriate penalty. See *Carlson*, 79 Ill. 2d at 590; *People v. Buggs* (1986), 112 Ill. 2d 284; *People v. Johnson* (1989), 128 Ill. 2d 253.

As previously noted, the defendant argues that the instant offenses arose from a domestic dispute: his wife, Lesia, had moved out of the marital abode in July 1987, and the defendant continually blamed his marital problems on Lesia's family; in December of 1987, Lesia filed for divorce, and thereafter obtained a protective order precluding the defendant from seeing her or their daughter, India; and he tried to contact Lesia the night before the offenses occurred, to persuade her to "come home." He also argues that the fact that he lacks a criminal record, and had an addiction to drugs at the time of the offenses, shows that the instant offenses occurred as a result of a one-time explosion that will never be repeated in a prison setting. Thus, he argues that in light of his marital difficulties, drug use, and extreme mental and emotional disturbance at the time of the crimes, the

death penalty was excessive, and he should be resentenced to a term of natural life imprisonment.

The State argues that death is an appropriate punishment in this case because the offense involved the planned and deliberate murders of defendant's sister-in-law and mother-in-law, coupled with the acts of raping his wife and his sister-in-law. The State also argued that evidence presented at trial showed: that the defendant told Lesia that he watched the Halcrombe home for at least a week prior to the murders; that, although he had no weapons with him when he broke into the house, he likely knew that Porter Halcrombe kept guns in the home; and that, on the morning of the offenses, he informed his former employer at the White Hen Pantry that he planned on taking care of his problem with his in-laws that day. Additionally, Lesia testified that the defendant told her how he would kill each member of her family, notably her mother (who was killed as defendant had described, with three bullets to the head). The State thus argues that death is appropriate and *Carlson*, *Buggs*, and *Johnson* are distinguishable.

In *Carlson*, the defendant, who was in his forties and had no prior criminal convictions, was sentenced to death for the murder of a police officer. This murder occurred while the defendant was attempting to avoid arrest for the murder of his former wife, which had occurred earlier that day. The court held that death was an excessive sentence in view of the the defendant's age, his lack of criminal record, his ill health, and his emotional instability over his ex-wife's plans to remarry. Additionally the court noted that the defendant was in the process of giving several thousand dollars to a friend to convey to his children at the time of his fateful encounter with the police officer. The court felt that the death penalty was improper as the defendant "would in all probability be leading a life acceptable to our society had

not his unfortunate marital affair triggered this tragic sequence of events." *Carlson*, 79 Ill. 2d at 590.

In *Buggs*, the defendant was sentenced to death for the murders of his wife and one of his children. The defendant had no prior criminal record, was in his forties, had served in the military, and had a serious drinking problem (which had become more severe just prior to the offenses). Prior to the offenses, the defendant's wife had told him that she wanted a divorce, which he resisted. On the day of the offenses, one of the defendant's wife's boyfriends persistently called her, which led to an argument between the defendant and his wife. During the argument, the defendant's wife told him that he was not the father of their two sons. At this point the defendant became outraged, poured gasoline on his wife and on the stairs, and lit a match. The defendant's wife, and two of their children, died as a result of the ensuing fire. The court found that the case was similar to *Carlson*, and vacated the death sentence. The court found that, had it not been for the extreme marital disharmony, the defendant would be leading "a life acceptable to our society." *Buggs*, 112 Ill. 2d at 295.

In *Johnson*, the defendant was sentenced to death for the murder of an employee of a store from which the defendant had been discharged a week prior to the offenses. Additionally, the store manager and another employee were injured as a result of the defendant's conduct. The court noted that the defendant's prior criminal record consisted of one misdemeanor, unlawful possession of a weapon, for which he successfully completed supervision. The defendant additionally had a satisfactory work record and showed a good potential for rehabilitation. This potential for rehabilitation was testified to by one of the victims of the crime, who urged the court not to impose the death sentence. The day of the shooting was the first payday after the defendant was

discharged, and he had been told he would be receiving a paycheck that day. The defendant's outburst appeared to have occurred after he was told, by the man who fired him, that there would be no check for him. The court held that "the retributive and deterrent functions of the death penalty will not be served by putting him [the defendant] to death." (*Johnson*, 128 Ill. 2d at 282.) The court then remanded the case to the trial court for a new sentencing hearing.

An individualized assessment of the accused and the circumstances of the offense is required for a court to impose the death penalty. (*People v. Tye* (1990), 141 Ill. 2d 1, 29.) In the present case, the defendant argued in mitigation: that he had only been arrested one previous time; that there was extreme marital discord at the time of the offenses; that he was addicted to cocaine; and that Dr. Tanay testified that he suffered from an extreme mental and emotional disturbance at the time of the offenses. However, while Dr. Tanay testified that his impending divorce was the "triggering event" for defendant's outburst, he also stated that there was clearly evidence of some planning prior to the occurrence. Thus, in distinction to *Carlson*, *Buggs*, and *Johnson*, the murders in the instant case did not occur suddenly, as a result of a single, definable "triggering event." Rather, the murders resulted from a series of events that the defendant, at least to some extent, planned. As the special circumstances present in *Carlson*, *Buggs*, and *Johnson* are not present here, we see no reason to disturb the jury's decision to sentence the defendant to death. See also *Tye*, 141 Ill. 2d at 30-31; *People v. Jimerson* (1989), 127 Ill. 2d 12, 53 (same arguments considered and rejected).

The defendant next asserts that he was denied a fair and reliable sentencing hearing because the trial court allowed into evidence Officer Tracy Jobe's testimony re-

garding the statements made to her by defendant's 3½-year-old daughter, India. Over defendant's objections, the trial court allowed the following testimony into evidence:

"Q. [Prosecutor]: Did you ask her if she saw—Did you ask India if she saw granny get hurt?

A. [Officer Jobe]: Yes.

Q. Did you ask her who hurt granny?

A. Daddy.

Q. Did you ask her how she got hurt?

A. She pointed to her forehead and said the bullets.

Q. Did you ask her where?

A. She said granny was in the kitchen.

Q. Did you ask her where she was?

A. She was standing next to Daddy.

MR. HOOKER [Defense Counsel]: I'd like to object as to the reliability and hearsay.

MR. DIFANIS [Prosecutor]: Did you ask India what happened after granny got hurt?

THE WITNESS [Officer Jobe]: She said that Daddy talked to her, took her into the bedroom.

Q. Took her or granny?

A. Took granny into the bedroom. Took granny into the bedroom.

\*\*\*

Q. Did you ask her who hurt mommy?

A. She said daddy did.

\*\*\*

Q. \*\*\* Did you ask her if she said anything to daddy when he hurt granny?

A. She told him don't."

Following Officer Jobe's testimony, the defendant moved for a mistrial, claiming that Officer Jobe's testimony denied him a fair and reliable sentencing hearing. The trial court found that the testimony did not deny the defendant a fair sentencing, and denied the defendant's motion. The trial judge noted that Officer Jobe's testimony was particularly relevant at this stage of the hear-

ing. During the second phase of a death penalty hearing, admissibility of evidence is determined by relevancy and reliability. The determination of whether evidence is admissible at the sentencing phase is within the sole discretion of the trial judge. *People v. Lyles* (1985), 106 Ill. 2d 373, 414.

The defendant argues that Officer Jobe's testimony was not reliable because it was based on the statements of a three-year-old child, who was never determined to be a competent witness. "Generally, the trial court must conduct a preliminary in-person examination of a witness of doubtful competency, such as a child, to determine competency to testify." *People v. Crews* (1967), 38 Ill. 2d 331, 338.

In *Crews*, the trial judge considered statements made by a defendant's 4½-year-old son, prior to sentencing the defendant to death. On appeal, this court reversed the defendant's death sentence, holding that the trial court should not have considered the child's statement without first conducting a competency examination of the child. (*Crews*, 38 Ill. 2d at 338-39.) On remand, the trial judge personally examined the defendant's, then six-year-old, son and found him to be incompetent to testify. (*People v. Crews* (1969), 42 Ill. 2d 60, 64.) The prosecution, however, called the son's foster mother who testified concerning statements that the boy had made. On appeal this court found:

> "Permitting this material [the statement] to be elicited from the witness [the stepmother] was clearly improper. The trial court found at the hearing that [the son] did not have the capacity to testify, yet allowed the foster mother to relate for its consideration what [the son] had told the witness when the boy was 4½ years old." *Crews*, 42 Ill. 2d at 64.

Although the *Crews* cases explain the proper method of analysis in the typical case, they can be distinguished,

as the instant case is not typical. In this case, Officer Jobe's testimony concerning India's statements to her was corroborated, and thus highly reliable. The testimony of both the pathologist and Lesia indicated that Mae Halcrombe's murder took place as India said it did. Additionally, the defendant's testimony, though not identical, provides corroborative support for India's statements to Officer Jobe. The prosecution has shown that the corroboration gives the statements sufficient indicia of reliability to be admissible at a sentencing hearing. We thus find that the trial judge did not abuse his discretion in allowing Officer Jobe's testimony concerning statements made to her by the defendant's daughter, India, into evidence at the sentencing hearing.

The defendant also argues that he was prejudiced when, after the testimony of mitigation witness Ronald Rickard was completed, the trial judge questioned the witness concerning the beginning of his relationship with the defendant. Rickard testified that he met the defendant, and another University of Michigan football player, while the two were students at the school. He also stated that both players had become his friends; that the defendant had visited his home and the home of his father-in-law; and that the defendant had always acted like gentleman around Rickard's children and family.

After the defendant's attorney and the prosecutor finished questioning Rickard, the trial judge asked some questions concerning exactly how he and the defendant met. Rickard then explained how he, and his father-in-law, had originally made contact with the defendant, and another University of Michigan player, when they were high school students in Florida, and the University was recruiting them.

The defendant argues that these questions were asked in the trial judge's personal effort to determine whether Rickard and the University of Michigan had vio-

lated any college athletic rules. He further argues that these questions were severely prejudicial because they shifted the jury's attention away from the serious issue of whether the defendant should be put to death or not.

The defendant failed to contemporaneously object to the questioning at trial, or raise the issue in his post-trial motion for a new trial. The issue is therefore waived for review in this court. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186.) Furthermore, the alleged error will not be reviewed as plain error because the evidence was not closely balanced, and any error made was not of sufficient magnitude to deny the defendant a fair sentencing hearing. *People v. Young* (1989), 128 Ill. 2d 1, 47.

The defendant next argues that he was denied a fair sentencing hearing due to two of the prosecutor's comments during rebuttal that: (1) the defendant "had shed no tears for what he had done"; and (2) the defendant "gunned down her [his daughter's] granny as she stood there by his side and said daddy, don't." Both comments were objected to at trial and raised in the defendant's post-trial motion for a new trial, so they are properly before this court.

An attorney has latitude during closing argument to discuss anything that is either directly proved by the evidence, or is a fair and reasonable inference from the facts as proved. (*People v. Mullen* (1990), 141 Ill. 2d 394, 404.) Thus, it is necessary to examine each statement to see if it is a fair and reasonable inference from the facts as proved.

The defendant argues that statement number one was unfounded because: prior to the testimony of his wife, the judge recessed the proceedings because the defendant was "visibly and audibly crying" at the counsel table; Detective Atterberry testified that, while he was interviewing the defendant, he broke down and

cried a couple of times; and he cried during his own testimony at the sentencing phase.

The defendant is correct in noting that he did cry on a number of occasions, including in front of the jury. However, the State argues that the argument was a reasonable inference from the evidence in the record: there was testimony that the defendant did not show such emotions at the time of the offenses; Lesia testified that the defendant was laughing on and off while he was threatening to kill her; and the bus driver who picked the defendant up immediately after the murders testified that he had a conversation with the defendant and that the defendant did not appear to be upset.

Clearly, the prosecutor made an incorrect statement of fact when he said that the defendant "had shed no tears" over the murders. However, although the remark was improper, this error does not rise to the level of reversible error. The defendant cried in front of the jury on a number of occasions. Thus, the jurors could make their own decisions as to whether or not the defendant "had shed no tears" over what he had done. Furthermore, in light of the defendant's guilty plea, and the overwhelming evidence presented at the sentencing phase of the trial, we do not find that this remark substantially prejudiced the defendant. See *People v. Coleman* (1989), 129 Ill. 2d 321, 347 (prosecutor's characterization of the defendant as "an animal, searching out his prey for money and pure pleasure in murdering" was found to be improper, but not prejudicial in light of the overwhelming evidence against the defendant).

In regards to statement number two, the defendant argues that there was no evidence in the record that the defendant's daughter said anything when he shot Mae Halcrombe and, therefore, the prosecutor's statement in rebuttal argument was highly prejudicial. However, as the following colloquy from Officer Jobe's testimony

shows, there was evidence of defendant's daughter's statement:

"Q. [Prosecutor]: Did you ask when she [defendant's daughter India] said that granny [Mae] had bullets in her head where were they?

A. She pointed to her forehead and said above each eye.

Q. You are pointing to your forehead above each eye. Did you ask her if she said anything to daddy [the defendant] when he hurt granny?

A. She told him don't."

As Officer Jobe testified that the defendant's daughter told him "don't," when he shot Mae, the prosecutor did not err in relating that evidence to the jury during her rebuttal closing argument.

The defendant next asserts that he is entitled to a new sentencing hearing because the jury had no authority to sentence him to death. He argues that the death penalty hearing was conducted in violation of section 9—1(d) of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(d)), which requires that a death penalty hearing be conducted before the jury that determined the defendant's guilt, or (if the defendant had pled guilty) a jury impanelled for the sole purpose of determining the penalty. The defendant asserts that, in the instant case, neither alternative had been used, as he pled guilty and then the jury which was impanelled to determine his guilt (and, if necessary, sentence) determined his sentence. Since a jury was not impanelled solely to determine his sentence, the defendant argues that the jury that sentenced him to death did not have jurisdiction to sentence him and, therefore, a new sentencing hearing is required.

The defendant has waived review of this alleged error. Not only did he not properly object to the procedure used at sentencing, the defendant chose it. The record

shows that when the court asked defense counsel what its position on the sentencing proceedings was, the following exchange took place:

"MR. HOOKER [Defense Counsel]: I believe Mr. Gosier [the defendant] is prepared to go with the Court *** [at] the second phase and it would be our intention to proceed with *the jury* at the final phase.

THE COURT: Okay. Is that correct, Mr. Gosier?

MR. GOSIER: Yes, sir, your Honor." (Emphasis added.)

Because defense counsel said *the* jury and not *a* jury, it is clear that he meant the jury previously impanelled to determine the defendant's guilt and, if it found him guilty, the defendant's sentence.

The defendant failed to object to the procedure the court used, or show cause as to how he was prejudiced by the procedure. The issue is thus waived for review by this court. *People v. Fields* (1990), 135 Ill. 2d 18, 69-70.

The defendant next contends that he was denied his right to effective assistance of counsel, and to a fair sentencing hearing, when the trial judge denied his motion for a continuance prior to the second stage of his sentencing hearing. Defense counsel told the trial judge that a continuance prior to the second stage of the sentencing hearing was necessary because: he was just appointed to represent the defendant (who had proceeded *pro se* during the guilt phase) two days earlier; he was unprepared to cross-examine some of the prosecution witnesses; he was having difficulty contacting potential mitigation witnesses, including some of defendant's former coaches and relatives; and he just found out that defendant's former mother-in-law, Ethel Mae Tillman, would be testifying.

"The granting or denial of a continuance is a matter resting in the sound discretion of the trial judge, and a reviewing court will not interfere with his decision un-

less there has been a clear abuse of discretion." (*People v. Collins* (1985), 106 Ill. 2d 237, 281.) It is not easy to determine when a trial court has abused its discretion in granting or denying a continuance. As the Supreme Court has stated:

> "The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. [Citation.] Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality." *Ungar v. Sarafite* (1964), 376 U.S. 575, 589, 11 L. Ed. 2d 921, 931, 84 S. Ct. 841, 849.

Although defense counsel was not technically "appointed" until two days prior to his request for a continuance, he was an integral part of the defendant's defense since the beginning of the proceedings. Prior to trial, counsel was appointed to represent the defendant, discharged, reappointed and, shortly before trial, discharged again. Upon his final discharge of defense counsel, the trial judge asked that he serve as stand-by counsel, and help the defendant, or even step in (as counsel) if necessary.

Defense counsel should not have been surprised by Tillman's testimony. At least four months prior to the trial, the State informed defense counsel of defendant's violent nature with his former family. Additionally, the two pretrial psychiatric reports described the defendant's violent relationship with his first wife and in-laws. Therefore, defense counsel was put on notice that such testimony may be introduced by defendant's former wife's family. Thus, it was within the trial court's discretion to grant or deny the motion for continuance, and we find that the court did not abuse its discretion in denying the motion.

In addition to the "surprise" of Tillman's testimony, defense counsel stated that a continuance was necessary because he was attempting to locate certain potential witnesses whose testimony would put the defendant in a "positive" light. These potential witnesses included some of the defendant's former football coaches, and some of defendant's relatives. This testimony would clearly have been cumulative testimony, as the defendant presented eight witnesses who testified about his "good" character. It was therefore not an abuse of discretion for the trial court to deny a continuance that defense counsel argued was necessary because he was having problems contacting potential witnesses.

Whether or not a trial judge should grant a continuance to allow defense counsel more time to prepare for his cross-examination of witnesses is a discretionary decision. In this case, the trial judge must have felt that since counsel had been involved with the case so long, a continuance was not necessary. That decision was not an abuse of discretion.

The defendant additionally contends that the actions of the trial court, in denying defense counsel's motion for a continuance, effectively denied him his right to counsel. In light of the fact that we have found that the trial court did not abuse its discretion in denying defense counsel's motion for a continuance, this argument must also be rejected. As the Supreme Court has stated:

"To hold otherwise would mean that the constitutional right to counsel would be implicated in almost every wholly permissible ruling of a trial judge, if it is made over the objection of the defendant's lawyer.

In an adversary system of criminal justice, there is no right more essential than the right to the assistance of counsel. But that right has never been understood to confer upon defense counsel the power to veto the wholly permissible actions of the trial judge. It is the judge, not counsel, who has the ultimate responsibility for the con-

duct of a fair and lawful trial." *Lakeside v. Oregon* (1978), 435 U.S. 333, 341-42, 55 L. Ed. 2d 319, 326, 98 S. Ct. 1091, 1096.

The defendant next argues that he was denied a fair sentencing hearing because the jury was not specifically instructed to consider the defendant's guilty plea as a mitigating factor. The trial court instructed the jury that:

"Mitigating factors include:

First: Any or all of the following supported by the evidence:

The defendant has no significant history of prior criminal activity is A, and

B. The murder was committed while the defendant was under the influence of an extreme emotional disturbance, although not such as to constitute a defense to the prosecution. That's B.

Second: *Any other reasons supported by the evidence why the defendant should not be put to death.*" (Emphasis added.)

The defendant argues that it was improper for the trial court to refuse a tendered instruction, simply because it is not specifically listed as a mitigating factor in the death penalty statute.

This court has repeatedly held that a defendant's request for a jury instruction on nonstatutory mitigation may be refused by the trial court so long as the jury is informed that it should consider all potential mitigating circumstances. (See, *e.g., People v. Spreitzer* (1988), 123 Ill. 2d 1, 40-41; *People v. Stewart* (1984), 105 Ill. 2d 22, 70; *People v. Free* (1983), 94 Ill. 2d 378, 419-20.) We find that the aforementioned instruction, given in this case, fully comports with the court's earlier precedents. We decline the defendant's invitation to reconsider our earlier decisions on this issue because:

"[w]hile the number of such possible mitigating factors is not infinite, it is certainly extremely large. Any listing of

160

such factors which is presented to the jury will always be open to the objections that it is incomplete and that it will tend to mislead the jury into thinking that they must limit themselves to the factors actually listed. Rather than requiring court and counsel to present the jury with a detailed laundry list of nonstatutory mitigation, we think it better to allow the court to instruct only on specific instances of statutory mitigation, while instructing the jury that they may consider any other nonstatutory mitigating factor." *Spreitzer*, 123 Ill. 2d at 41.

The defendant also contends that he was denied a fair sentencing hearing because of the trial court's refusal to modify the sentencing verdict forms to inform the jury that the only alternative to a sentence of death was a term of natural life imprisonment. This court has stated that, in a multiple-murder situation, a jury must be instructed that the only alternative to a death sentence is natural life without the possibility of parole:

> "An instruction in the case of multiple murders should state that if the jury finds mitigating factors sufficient to preclude imposition of the death penalty, the defendant will be sentenced to natural life imprisonment, and no person serving a term of natural life imprisonment can be paroled or released, except through executive clemency." *People v. Gacho* (1988), 122 Ill. 2d 221, 262.

In the instant case, the trial court did give an instruction that precisely tracked the quoted language from *Gacho*. The defendant complains that the trial court erred in denying his request to tender to the jury the following verdict form:

> "We, the jury do not unanimously find that there are no mitigating factors sufficient to preclude a death sentence. The court shall not sentence the defendant Harry Gosier to death. *The court shall sentence the defendant to natural life imprisonment.*" (Emphasis added.)

The court instead delivered the identical instruction without the highlighted portion, which is identical to Illi-

nois Pattern Jury Instructions, Criminal, No. 7C.09 (2d ed. Supp. 1989). The defendant argues that when the jury analyzed the potential verdict forms and the instructions, it would find them ambiguous and confusing, and thus, a new sentencing hearing is necessary.

It should initially be noted that the defendant's tendered verdict form was defective, in that it only described the potential sentence as "natural life imprisonment." Describing a sentence as natural life imprisonment, without parole, " 'is simply inaccurate when the governor possesses authority to commute the sentence to a lesser sentence that includes the possibility of parole.' " *Gacho*, 122 Ill. 2d at 262, quoting *California v. Ramos* (1983), 463 U.S. 992, 1009, 77 L. Ed. 2d 1171, 1186, 103 S. Ct. 3446, 3457-58.

Defendant's argument that the jury was confused by the verdict form and instructions is speculative at best. The Supreme Court has recently noted:

> "There is, of course, a strong policy in favor of accurate determination of the appropriate sentence in a capital case, but there is an equally strong policy against retrials years after the first trial where the claimed error amounts to no more than speculation. Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting." (*Boyde v. California* (1990), 494 U.S. 370, 380-81, 108 L. Ed. 2d 316, 329, 110 S. Ct. 1190, 1198.)

A review of the instructions and verdict forms actually tendered to the jury in the instant case shows that they were clearly proper, and did not deny the defendant a fair sentencing hearing.

The defendant also argues that the jury instructions, as a whole, deprived him of a fair sentencing because the jurors may have believed that they could not consider sympathy, mercy, or compassion in deciding whether or not to impose the death sentence. It is not necessary for us to address this issue, as the defendant has waived it for review because he failed to specifically object on this ground at the instructions conference, and he failed to raise the issue in any of his post-trial motions. *People v. Caballero* (1984), 102 Ill. 2d 23, 41.

The defendant next asserts that he was not given a fair sentencing hearing when the trial court denied him his right to allocution. This court has held that there is no right to allocution at a death sentencing hearing (*People v. Morgan* (1991), 142 Ill. 2d 410, 469; *People v. Gaines* (1981), 88 Ill. 2d 342, 374-79), and therefore the trial court's actions were proper.

Finally, in regards to his sentencing hearing, the defendant contends that he was denied a fair sentencing hearing when the trial court refused to limit the State to one closing argument at the conclusion of the sentencing hearing. This procedure has been found to be proper, and not violative of any of defendant's constitutional rights (*Morgan*, 142 Ill. 2d at 469; *People v. Williams* (1983), 97 Ill. 2d 252, 302-03); thus there was no error in the trial court's allowance of this procedure.

## CONSTITUTIONALITY OF THE ILLINOIS DEATH PENALTY

The defendant initially argues that the Illinois death penalty statute is unconstitutional because it does not require the State to prove, beyond a reasonable doubt, that there were no mitigating factors sufficient to preclude the imposition of the death sentence. This court has recently examined this argument and has found that the Illinois death penalty statute is not unconstitutional

on this ground. See *People v. Bean* (1990), 137 Ill. 2d 65, 138; *People v. Franklin* (1990), 135 Ill. 2d 78, 120.

The defendant also argues that the Illinois death penalty statute is unconstitutional because, after a defendant is found eligible for a death sentence, the statute places the burden on the defendant to prove that a sentence of death should not be imposed. This court has recently determined that the Illinois death penalty statute is not unconstitutional on this ground (*Bean*, 137 Ill. 2d at 138-40; *Franklin*, 135 Ill. 2d at 120), and we decline to reconsider the issue here.

In a related argument, the defendant argues that the trial court in the case at bar informed the jury (in both oral and written instructions) that the death penalty was presumed appropriate, and thus, the defendant has the burden of persuading the jury that death is not appropriate.

At the second phase of the sentencing hearing, prior to oral arguments, the trial court instructed the jury:

> "Under the law the defendant shall be sentenced to death if you unanimously find that there are no mitigating factors sufficient to preclude imposition of the death sentence."

The language that the trial judge used in this instruction precisely follows the wording of the Criminal Code, and clearly does not imply to the jury that death is presumptively appropriate. See Ill. Rev. Stat. 1987, ch. 38, par. 9—1(g).

The written instructions tendered to the jury, as modified and approved by the defendant, stated:

> "If you unanimously find from your consideration of all the evidence that there are no mitigating factors sufficient to preclude imposition of a death sentence, then you should sign the verdict requiring the court to sentence the defendant to death.

If you do not unanimously find from your consideration of all the evidence that there are no mitigating factors sufficient to preclude imposition of a death sentence, then you should sign the verdict requiring the court to impose a sentence other than death."

The instructions that the trial court tendered are fully compatible with Illinois law. In *People v. Ramirez* (1983), 98 Ill. 2d 439, 469, the court stated that "[a]t stage two [of the sentencing hearing], the jury must make the determination that there are no mitigating factors sufficient to preclude the imposition of the sentence of death." A reading of the trial court's instructions shows that they were clearly proper as an accurate statement of Illinois law.

The defendant argues that, although the instructions may have been technically correct, the jury may have understood that it was the defendant's burden to prove mitigating factors sufficient to preclude the death sentence, and not the State's burden to prove an absence of mitigating factors to preclude the sentence. See *Gaines v. Thieret* (N.D. Ill. 1987), 665 F. Supp. 1342.

The defendant did not object to the instructions at trial or in a post-trial motion (and, in fact, had approved of them at the instructions conference). The defendant's challenge to the instructions is therefore waived. (*People v. Pitsonbarger* (1990), 142 Ill. 2d 353, 409.) Furthermore, this court has already found that these instructions and statements do not misstate the law or deny the defendant a fair sentencing hearing. *Pitsonbarger*, 142 Ill. 2d at 409; *People v. Thomas* (1990), 137 Ill. 2d 500, 539-40.

The defendant finally argues that the Illinois death penalty statute is unconstitutional because it does not sufficiently minimize the risk of an arbitrarily and capriciously imposed death sentence. He states that, although various aspects of the Illinois death penalty statute (in-

cluding the prosecutor's discretion to seek the death penalty, the absence of a requirement for pretrial notice, the limited comparative proportionality review which this court undertakes of death sentences, the absence of a requirement for a written finding by the sentencer, the absence of a requirement limiting evidence of aggravating circumstances to that made known to the defendant prior to trial, the absence of a burden of proof on the prosecution, and the preclusion of the sentencer's consideration of the exact range of sentences applicable if the death sentence is not imposed) have been upheld as constitutional, collectively they function to make the Illinois death sentencing scheme unconstitutionally arbitrary and capricious.

This issue has previously been raised and has been rejected by this court. (See *Pitsonbarger*, 142 Ill. 2d at 409; *Thomas*, 137 Ill. 2d at 549-50; *People v. Phillips* (1989), 127 Ill. 2d 499, 542-43.) In *Phillips*, this court observed:

"While this court is cognizant of that old adage that the whole is greater than the sum of its parts, we fail to see how such an adage could be of assistance in such a case as this. If all of the individual aspects are constitutional, we stand by the conclusion that the whole is also constitutional." (*Phillips*, 127 Ill. 2d at 542-43.)

The defendant raises no new arguments here that persuade us to reconsider this court's earlier holdings that the Illinois death penalty statute is constitutional.

For all the reasons stated, we affirm the defendant's convictions and sentences for murder and aggravated criminal sexual assault. The clerk of this court is directed to enter an order setting Wednesday, January 15, 1992, as the date on which the death sentence, entered in the circuit court of Champaign County, is to be carried out. Defendant shall be executed in the manner provided by law (Ill. Rev. Stat. 1987, ch. 38, par. 119—5). The

clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden at Stateville Correctional Center, and the warden of the institution in which the defendant is confined.

*Judgment affirmed.*