(No. 71893.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. PATRICK PAGE, Appellant.

*Opinion filed June 17, 1993.—Rehearing denied October 4, 1993.*

Charles M. Schiedel, Deputy Defender, and Timothy M. Gabrielsen, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Roland W. Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee Goldfarb and Noreen M. Daly, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HARRISON delivered the opinion of the court:

On July 21, 1987, defendant, Patrick Page, was indicted in Cook County for two counts of murder, two counts of armed violence and one count of armed robbery. The armed violence counts were dismissed prior to trial. Following a jury trial, defendant was found guilty of the murder and armed robbery of Charles Howell. After finding defendant eligible for the death penalty based on two statutory aggravating factors, the jury found there were insufficient mitigating factors to preclude imposition of the death sentence. Defendant was sentenced to death, as well as to an extended term of 60 years' imprisonment for the armed robbery conviction. The death sentence was stayed (134 Ill. 2d R. 609(a)), pending direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d R. 603).

The State adduced the following evidence at trial. Joan Howell testified that on the evening of October 3, 1985, she was at her residence in Park Forest, Illinois, with her 19-year-old son, Charles. At approximately 7:30 p.m., Charles received a telephone call and decided to go out, telling his mother that he had a chance to make $25. When Charles left that evening, he was wearing blue jeans, a charcoal-grey shirt, a blue jean jacket, a vest and a black leather wristband. Mrs. Howell stated that Charles left in a brown Camaro which she believed

belonged to him.[1] Mrs. Howell testified that after Charles left home on the evening of October 3, 1985, she never saw him again. In July 1987, police informed her that her son's body had been found buried in the woods in Park Forest.

Michelle Kury testified that she had dated defendant in the summer and fall of 1985. On a night in early October 1985, Kury, defendant, Gerald Feinberg and Howell were present in the basement of defendant's mother's home. Kury stated that the group was "just sitting around drinking, and then [defendant] was running up and down the stairs, making phone calls." Defendant stated that he had arranged a meeting with some teenagers in the forest preserve behind Dogwood School to make a marijuana deal. According to Kury, defendant, Feinberg and Howell left at approximately 9 p.m. The following morning between 2 and 3 o'clock defendant and Feinberg returned to the Page residence. When Kury asked where Howell was, defendant stated that Howell had met one of his friends and had gone to stay with him for a few days, leaving his car with defendant. Kury stated that the defendant looked "scuffed up" when he returned home, but she did not see any blood on him. Later that morning, Kury saw Charles Howell's car on the street outside the Page residence. Kury testified that defendant drove Howell's car for several days and after unsuccessfully trying to sell it to a friend of hers, defendant finally sold it to a junkyard in south Chi-

---

[1] Mrs. Howell further testified that she later discovered that the car actually belonged to the mother of Charles' friend Andrew Devine. Devine had stayed at the Howell residence for approximately four months during the summer of 1985. The parties stipulated that Devine's body was found in an empty stream bed in Will County on November 2, 1985, and that Devine's death was classified as a homicide.

cago. In the days following Howell's disappearance, defendant told Kury that Howell might have gone to Calumet City with some friends or that he might have gone to look for Andrew Devine.

Sergeant James Keith of the Olympia Fields police department testified that he arrested defendant on May 16, 1987, in connection with a separate investigation he was conducting. Sergeant Keith and Cook County Assistant State's Attorney David Sterba spoke with defendant at the Olympia Fields police department on the morning of May 19, 1987, concerning Charles Howell's disappearance. After being advised of his *Miranda* rights, defendant told them that he and Gerald Feinberg had taken Howell to a forest preserve where they stabbed him to death and buried him.

Sergeant Keith further testified that defendant accompanied him, Sterba and Sergeant Marsala to Thorn Creek Woods on May 19, 1987, to search for the burial site. Because of overgrowth and standing water, they were unable to find Howell's body at that time. Sergeant Keith stated that he was involved in three or four other futile attempts to find Howell's grave before it was finally discovered on July 1, 1987, in the clearing area where defendant and Feinberg had indicated.

Sterba testified defendant stated that he and Feinberg had planned to kill Howell in order to cover up their participation in the murder of Andrew Devine. Defendant told Sterba that he and Feinberg planned Howell's murder by drawing a map of the area where they would bury him, taking shovels from defendant's home and from the home of a neighbor, going to that site in advance to dig a hole, and luring Howell to the site under the pretense of having a party and engaging in a transaction there. According to Sterba, defendant said that he stabbed Howell and that Feinberg hit him in the head with a piece of wood.

Sterba testified that he spoke with defendant again on the afternoon of May 19. Defendant stated that he and Feinberg had killed Howell because Howell had been a roommate of Andrew Devine and that Devine's disappearance would raise questions in Howell's mind. Defendant agreed to give a statement to a court reporter, which began at 4:20 p.m. that day. Defendant's court reported statement, which was consistent with his oral statements but included additional details, was read to the jury.

Defendant indicated in the statement that he drew a map of the woods in Park Forest on his basement floor in order to show where they would bury Howell. The same day that he drew the map, defendant and Feinberg went to the woods to dig the hole where they ultimately buried Howell. In defendant's statement, he admitted stabbing Howell once in the chest. Defendant stated that Howell tried to run and that Feinberg then hit him 10 to 15 times in the head with a stick the size of a baseball bat. Defendant checked Howell's pulse and, finding none, he and Feinberg laid Howell in the hole that they had dug and covered him with dirt. They placed some branches over the grave, and burned them by starting a fire with lighter fluid.

According to defendant's statement, Feinberg took Howell's car keys from the pocket of Howell's jeans prior to burying him, and gave the keys to defendant as they were leaving the woods. Defendant stated that he wanted the keys because Howell's car was parked in front of his house. Defendant's statement described in detail the clothes Howell was wearing the night they murdered him, including the "punk rocker" wristband.

Defendant's statement revealed that upon returning to his house, he and Feinberg "smoked some pot and then cruised around in [Howell's] car for awhile." Defendant stated that he changed clothes and washed

what he had been wearing because it was dirty. Defendant kept Howell's car for three or four days before selling it to a junkyard in Chicago Heights for $50.

Robert Maeyama testified that on May 19, 1987, he was the police captain in charge of field operations for the Village of Park Forest. On that date, he twice went to defendant's residence to obtain evidence of the map drawn on the basement floor. On the first occasion, after receiving permission to search the residence from defendant's mother, Maeyama took photographs of the basement floor but was not satisfied with their clarity. Maeyama therefore left defendant's residence and enlisted the aid of Cook County evidence technicians who had more sophisticated camera equipment. Maeyama testified that upon his return to the Page residence with the technicians that afternoon, he again received permission to search from Mrs. Page and went to the basement. There he discovered Paul Page and Smokey Page attempting to scrub the floor with water and bleach. Maeyama dried the markings, which were photographed by evidence technicians, and made an onionskin tracing of the map.

Officer Robert Mazor, an evidence technician with the Cook County sheriff's police department, testified that he was assigned to process the crime scene in Thorn Creek Woods on July 1, 1987. Mazor retrieved human skeletal remains from a depression filled with mud and water. The skeletal remains and clothing recovered were placed in a body bag and taken to the county morgue for an autopsy. Mazor testified to having recovered a number of items from the grave site, including a pair of shoes, vest, jacket, shirt, and a "leather metal wristband." Mazor also identified People's Exhibit 22 as a piece of wood that was found to the southwest of the grave site with what appeared to be hair and clothing fibers attached to it.

Dr. Robert Stein, chief medical examiner of Cook County, testified to having performed an autopsy on the body of Charles Howell on July 12, 1987. Dr. Stein testified that he was able to identify Howell's markedly decomposed body through the use of dental records. Dr. Stein stated that Howell's clothes revealed numerous cuts consistent with stab wounds and opined that the cause of death was multiple stab wounds. Dr. Stein's examination of the skull showed no evidence of any head injuries, but he stated that because there was no tissue remaining on the skull, he was unable to determine if Howell had sustained blows to the head.

The defense declined to present any evidence. The State's alternative theories of murder, upon which the court instructed the jury, charged defendant with intentionally killing or doing great bodily harm, knowing that his acts would cause death, knowing that his acts created a strong probability of death or great bodily harm and felony murder based on the offense of armed robbery. The jury returned a general verdict of guilty on the murder charge and found defendant guilty of armed robbery.

In the first phase of the bifurcated sentencing hearing, the State argued that defendant was eligible for the death penalty based on the felony-murder and multiple-murder statutory aggravating factors. Through the testimony of Assistant State's Attorney Sterba, the State introduced transcribed statements which were given by defendant on May 19, 1987, and which detailed his participation in the murders of John Goodman in Cook County and Andrew Devine in Will County. The State also introduced certified statements of defendant's convictions for the murders of Goodman and Devine and defendant's birth certificate, which indicated that he was born on February 24, 1964. The jury found defendant eligible for the death penalty under both the felony-mur-

der and multiple-murder provisions of the Illinois statute.

In the second phase of the sentencing hearing, the parties presented evidence and testimony in aggravation and mitigation. Following deliberations, the jury rendered its verdict that there were no factors sufficient to preclude the imposition of the death penalty.

Additional relevant facts will be presented within the framework of individual issues discussed.

Defendant first argues that he should not have been found eligible for the death penalty on the ground that the murder of Charles Howell was committed in the course of an armed robbery, where the taking of property occurred after Howell's death and the intent was to eliminate a witness to another crime rather than to take property. However, the jury found defendant eligible for the death penalty on the basis of *two* separate statutory aggravating factors: felony murder and multiple murder (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(b)(3), (b)(6)). Therefore, we need not determine whether defendant's eligibility based upon murder in the course of an armed robbery is subject to attack on the grounds advanced by defendant. Defendant was independently eligible for the death penalty based upon the multiple-murder provision. Thus, even if, *arguendo*, we were to conclude that defendant's eligibility was improperly premised on murder in the course of an armed robbery, the validity of defendant's eligibility would not be impaired because a separate, valid aggravating factor supported the jury's finding. *People v. Hampton* (1992), 149 Ill. 2d 71, 90; see also *Zant v. Stephens* (1983), 462 U.S. 862, 880-90, 77 L. Ed. 2d 235, 252-58, 103 S. Ct. 2733, 2744-50; *People v. Coleman* (1989), 129 Ill. 2d 321, 343.

The Illinois death penalty statute does not place special emphasis on any one aggravating factor and does not accord any special significance to multiple aggravat-

ing factors as opposed to a single aggravating factor. Once one such factor is proved, the defendant is eligible for death regardless of whether other factors exist as well. (*Coleman*, 129 Ill. 2d at 345-46.) Defendant does not challenge the jury's finding that he was eligible for the death penalty based upon his commission of multiple murders. Thus, it is unnecessary to address the propriety of the finding that another aggravating factor existed.

Defendant, however, argues that his death sentence must be vacated and the cause remanded for resentencing if either of the two aggravating factors upon which he was found eligible for the death penalty is invalid. Defendant cites this court's decision in *People v. Brownell* (1980), 79 Ill. 2d 508, as support for this contention. Defendant's reliance on *Brownell* is erroneous.

In *Brownell*, this court did find one of the two aggravating factors upon which the defendant's eligibility was based to be defective. However, this court concluded that resentencing was mandated only because, at the second phase of the sentencing hearing, the sentencing body could have considered an aggravating factor which was not warranted by the evidence. *Brownell*, 79 Ill. 2d at 535-36.

Here, unlike in *Brownell*, the jury did not rely on an aggravating factor that did not exist. As this court recently stated in *People v. Pasch* (1992), 152 Ill. 2d 133, 190:

"Once it had been determined that defendant was eligible for the death penalty, by virtue of his actions falling within one of the 10 aggravating factors detailed under section 9—1(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)), the jury could consider *any* aggravating factors. It was not limited to those set forth in subsection (b) in determining whether to impose

the death penalty. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(c).)'' (Emphasis in original.)

Therefore, *Brownell* would not require resentencing in the case at bar, even were the armed-robbery-based aggravating factor invalidated, because the jury was entitled to consider defendant's same conduct in making its sentencing determination. See *Pasch*, 152 Ill. 2d at 190; *Hampton*, 149 Ill. 2d at 92.

We next address defendant's contention that his death sentence must be vacated because he was precluded from presenting to the jury at the second stage of his sentencing hearing nonstatutory mitigation evidence that his codefendant, Gerald Feinberg, had pled guilty and was sentenced to life imprisonment for the murder of Charles Howell. However, we find that defendant's request to have the jury consider evidence of a codefendant's sentence is neither constitutionally required nor relevant to the jury's examination of the individual defendant's characteristics and the circumstances of his offense.

Comparative proportionality review in death penalty cases is not required by the United States Constitution (*Pulley v. Harris* (1984), 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871) and is not a feature of the capital sentencing process in Illinois (*People v. Jimerson* (1989), 127 Ill. 2d 12, 54). Nevertheless, this court will, in appropriate cases, consider whether a sentence of death is disproportionately harsh in comparison with a less severe sanction imposed on a codefendant convicted of the same crime. (See *Jimerson*, 127 Ill. 2d at 54-55; *People v. St. Pierre* (1992), 146 Ill. 2d 494, 512-14; *People v. Glecker* (1980), 82 Ill. 2d 145, 166-69, 171.) Such judicial review acknowledges the necessity to avoid arbitrary or capricious death sentences by insuring that the cases in which death is imposed are rationally distinguished from those in which it is not imposed. See *Glecker*, 82 Ill. 2d

at 161-62, 166; *St. Pierre*, 146 Ill. 2d at 513; *People v. Perez* (1985), 108 Ill. 2d 70, 93.

However, in the instant case, defendant does not request that this court undertake a review of the proportionality of his sentence. Rather, defendant argues that his codefendant's sentence and relative degree of participation in the murder should have been considered by the jury at the second stage of his sentencing hearing. We disagree because we believe that evidence that a codefendant received a sentence less than death is not a proper mitigating factor for consideration at a death penalty hearing.

"Imposition of the death penalty requires, as a constitutional matter, an individualized consideration of both the offender's character and the circumstances of his offense." (*Jimerson*, 127 Ill. 2d at 52-53; *Eddings v. Oklahoma* (1982), 455 U.S. 104, 110-12, 71 L. Ed. 2d 1, 8-9, 102 S. Ct. 869, 874-75.) This individualized sentencing requirement is satisfied by allowing the sentencer in capital cases to consider all relevant mitigating evidence. (*Blystone v. Pennsylvania* (1990), 494 U.S. 299, 307, 108 L. Ed. 2d 255, 264, 110 S. Ct. 1078, 1083.) However, the determination of what factors should be deemed relevant to a capital sentencing decision is a matter of State determination. *Gregg v. Georgia* (1976), 428 U.S. 153, 192, 49 L. Ed. 2d 859, 885, 96 S. Ct. 2909, 2934.

Defendant urges this court to adopt the view of the Florida Supreme Court in *Messer v. State* (Fla. 1976), 330 So. 2d 137, that evidence that a codefendant received a sentence less than death is a relevant factor for that State's capital sentencing body to consider. However, in *Messer*, the Florida Supreme Court reasoned that defendants should not be treated differently upon the same or similar facts. Therefore, the court concluded, where there was "little to separate out the joint conduct of the co-defendants which culminated in the

death of the decedent," the sentencer "should have had the benefit of the consequences suffered by the accomplice in arriving at its recommendation of the sentence to be visited upon the [defendant]." *Messer*, 330 So. 2d at 142.

Thus, it appears that the Florida court believed that it was necessary for the sentencer to consider evidence of a codefendant's sentence in order to prevent unjustified disparity between equally culpable defendants. As noted earlier, that safeguard exists in Illinois at the appellate level. This court declines to find that a codefendant's sentence is a relevant mitigating factor for consideration at the trial level, where the focus is on the individual characteristics of the defendant and *his* participation in the offense. As this court stated in *Perez*, "the fact that a separate jury found there were mitigating factors sufficient to preclude the imposition of the death penalty as to [a codefendant] does not mean that we must set aside the jury's determination in the present case that as to [defendant] there was no mitigating factor or factors sufficient to preclude its imposition." *Perez*, 108 Ill. 2d at 93.

Further, requiring the sentencer to examine and compare the relative culpability of the defendants and the circumstances in aggravation and mitigation applicable to each would unnecessarily complicate an already difficult task. Therefore, because evidence of a codefendant's sentence is not a relevant mitigating factor, defendant's constitutional rights were not violated by the trial court's refusal to permit him to introduce evidence that Gerald Feinberg had pled guilty and been sentenced to life imprisonment for the murder of Charles Howell.

We next examine defendant's contentions that he was deprived of a fair sentencing hearing due to prejudice caused by improprieties in the prosecutor's cross-examination and closing argument. During the second phase of

his sentencing hearing, defendant presented mitigation evidence in an attempt to show that he had suffered from an extreme mental or emotional disturbance at the time Charles Howell was murdered. (See Ill. Rev. Stat. 1985, ch. 38, par. 9—1(c)(2).) Dr. Gerald Girdaukas, a clinical psychologist, testified on defendant's behalf that defendant suffered from major depression, organic brain syndrome, and personality disorder. Dr. Girdaukas based his diagnosis on three to four hours that he had spent talking with defendant, a review of court records, and his assessment of psychological tests that had been previously administered to defendant.

On cross-examination, Dr. Girdaukas testified that organic brain syndrome is characterized by a lesion on the brain which could be a neoplasm, a disease, or scar tissue. Dr. Girdaukas stated that in defendant's case, the lesion was located on the left side of the brain and constituted an actual malformity or physical damage to the brain. At this point, the following colloquy occurred between the prosecutor and Dr. Girdaukas:

"Q. [Prosecutor]: You can, as you sit there now, say that this is what's on his brain?

A. [Dr. Girdaukas]: Yes, I can.

Q. Damage to it?

A. Yes.

Q. And this is based on these written tests that you have done?

A. That's correct.

Q. You haven't done any kind of physical examination, such as an EEG, to determine this, is that correct?

A. That's correct.

Q. You haven't actually looked inside of his head and looked at his brain to see?

A. We have tended to do better than that. No, we have not looked into his head.

Q. So, again, it's speculation based on tests that you, yourself, did not administer?

A. It is a conclusion that is more accurate than most CT scans, based upon standardized testing.

Q. What you're saying is the tests that you administered have given you results which allow you to say more conclusively than a medical doctor or psychiatrist coming in here and saying I administered an EEG, and these are the results that I obtained.

You're saying that your conclusions are more specific than that?

A. Yes."

In closing argument, defense counsel summarized the testimony of Dr. Girdaukas and argued that it supported the statutory mitigating factor that defendant suffered from an extreme mental or emotional disturbance. In rebuttal, the prosecutor argued that Dr. Girdaukas' conclusions lacked credibility because he was only a psychologist, "not an M.D. or a psychiatrist," who had merely evaluated test results that he did not administer himself. The prosecutor then stated: "Believe me, ladies and gentlemen, if there was any kind of medical evidence to support his theories, you would have had X-rays, CAT scans, MRI's. There would have been 20 psychiatrists—." At this point, defense counsel objected and the trial court sustained the objection, additionally instructing the jury, "If the lawyers say anything that's not evidence in this case, you're not to consider it as such. You're to rely on your own memories of the evidence."

Defendant argues that the prosecutor's cross-examination and rebuttal argument questioning the validity of Dr. Girdaukas' diagnosis constituted error, where the prosecution offered no medical evidence to refute Dr. Girdaukas' testimony. Defendant contends that the questions asked by the prosecutor during cross-examination were based upon or presumed facts not in evidence and were therefore improper where the prosecutor failed to present testimony in rebuttal to support the inferences

that he sought to have the fact finder draw. (See *People v. Nuccio* (1969), 43 Ill. 2d 375.) However, defendant's claim that this cross-examination was unperfected impeachment has been made for the first time in this appeal. Therefore, consideration of this issue is waived for review. Compare *Nuccio*, 43 Ill. 2d at 394; see also *People v. Collins* (1985), 106 Ill. 2d 237, 271; *Pasch*, 152 Ill. 2d at 168.

Furthermore, we do not consider the prosecutor's cross-examination to constitute unperfected impeachment. This court recently addressed the scope of the cross-examination of an expert witness in *Pasch*, stating:

> " 'On cross-examination, counsel may probe the witness's qualifications, experience and sincerity, weaknesses in his basis, the sufficiency of his assumptions, and the soundness of his opinion.' [Citation.] An expert may also be cross-examined with respect to material reviewed by the expert but upon which he did not rely. (*Piano v. Davison* (1987), 157 Ill. App. 3d 649, 671-72.) 'Counsel is also permitted to test the knowledge and fairness of the expert by inquiring into what changes of conditions would affect her opinion [citation], and in conducting such an inquiry, \*\*\* the cross-examiner is not limited to facts finding support in the record.' [Citation.] Likewise, an expert may be cross-examined for the purpose of explaining, modifying, or discrediting his testimony, as well as to ascertain what factors were taken into account and what ones disregarded in arriving at his conclusions. See *People v. Fields* (1988), 170 Ill. App. 3d 1, 14." (*Pasch*, 152 Ill. 2d at 179.)

We believe the prosecution's cross-examination of Dr. Girdaukas, which questioned his ability to detect lesions on the defendant's brain without the benefit of a physical examination or tests such as an EEG, was proper and within the scope outlined by this court in *Pasch*.

As for defendant's contention that the prosecutor's rebuttal argument improperly insinuated that Dr. Gir-

daukas' diagnosis was incredible because it was not supported by "any kind of medical evidence," we are unconvinced that the comments were prejudicial error. Generally, prosecutors are permitted wide latitude in their closing arguments, although their comments must be based on the facts in evidence or upon reasonable inferences drawn therefrom. (*People v. Fields* (1990), 135 Ill. 2d 18, 64.) Here, the State argues that the prosecutor's rebuttal was proper commentary on defendant's argument that Dr. Girdaukas' testimony constituted evidence in mitigation.

Although we agree that such comments are within the bounds of proper argument, even were the comments improper, we do not think they served to deny defendant a fair trial. The trial court sustained defense objections to the comments and instructed the jurors that closing arguments are not to be considered as evidence and that they should disregard statements to which an objection had been sustained. (See *People v. Henderson* (1990), 142 Ill. 2d 258, 326.) Therefore, where defendant has not shown that the remarks of the prosecutor were so prejudicial and improper that they could not be cured by an admonition to the jury, no grounds exist upon which to vacate his sentence. See *Fields*, 135 Ill. 2d at 58.

Nor are we persuaded that the prosecutor's reference in closing argument at sentencing to defendant's previous escape conviction was prejudicial or improper. The State presented as evidence in aggravation at defendant's sentencing hearing the testimony of Thomas Cosgrove, a supervising caseworker with the Department of Corrections. Cosgrove testified that in May 1983, defendant was transferred from Logan Correctional Center, where he was serving time for a series of burglaries, to the Salvation Army Work Release Center in Chicago. On December 5, 1983, defendant was charged with es-

cape and a warrant for his arrest was issued when he failed to return to the center. Cosgrove stated that following defendant's return to the center on January 2, 1984, he was prosecuted and found guilty of escape and was returned to the penitentiary to serve out the remainder of his original sentence.

During rebuttal argument at the second stage of the sentencing hearing, the prosecutor stated:

"Again, Counsel has brought up this rehabilitation as one of the factors in mitigation, about how [defendant] will be a good boy when he goes to the penitentiary.

You saw what happened when he went to the penitentiary. He escaped."

Defendant argues that this statement by the prosecutor was a misrepresentation of the evidence and improperly implied that, if not sentenced to death, defendant would escape and be a future threat to society. However, where defendant failed to object at the time of the argument or raise the matter in his post-trial motion, this claim of prosecutorial misconduct has not been preserved for review. (*People v. Hooper* (1989), 133 Ill. 2d 469, 492; *People v. Collins* (1985), 106 Ill. 2d 237, 275.) Regardless, the prosecutor's argument was both relevant and a proper characterization of the evidence.

Although defendant maintains that failing to return from a work release assignment is "not remotely similar to escaping from a penitentiary," under section 31—6 of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 31—6) defendant's conduct constituted escape. Section 31—6 states:

"Escape; failure to report to a penal institution or to report for periodic imprisonment. (a) *** a person convicted of a felony who knowingly fails to report to a penal institution or to report for periodic imprisonment at any time or knowingly fails to return from furlough or

from work and day release is guilty of a Class 3 felony." Ill. Rev. Stat. 1985, ch. 38, par. 31—6(a).

Therefore, where the jury had heard the testimony of Cosgrove concerning defendant's failure to return from work release and his subsequent prosecution and conviction for escape, and where the record shows that the prosecutor, during the opening portion of closing argument, reiterated these facts, we cannot say that the complained-of comment was inaccurate. Furthermore, we believe that the prosecutor's rebuttal argument, made for the purpose of reflecting on defendant's potential for rehabilitation, was a relevant and proper argument. See *People v. Lego* (1987), 116 Ill. 2d 323, 346-47.

Defendant also requests that we reconsider that portion of this court's decision in *People v. Gacho* (1988), 122 Ill. 2d 221, which directs trial courts, when conducting a capital sentencing hearing involving a defendant convicted of multiple murders, to instruct juries that a person serving a term of natural life imprisonment will not be paroled or released except through executive clemency. Defendant argues that this instruction allows the jury to speculate that, if not put to death, the defendant might one day be released.

In the instant case, during the closing argument at the second stage of defendant's sentencing hearing, the prosecutor stated:

> "Now, [defense] Counsel has made much to do about natural life, and he said: Oh, he will be in prison for the rest of his life.
>
> When he was reading to you his instruction: 'No person serving a sentence of natural life imprisonment can be paroled or released,['] And his voice kind of dropped at this part, 'except through an order by the Governor for executive clemency.'
>
> You take your impression of what that instruction means. But you know what the death penalty means."

Defendant asserts that this argument invited the jury to speculate that defendant might one day be released and that such an argument improperly diverts the sentencing jury's attention from a consideration of relevant aggravating and mitigating factors. See *People v. Szabo* (1983), 94 Ill. 2d 327, 365-67; *Fields*, 135 Ill. 2d at 58 (injecting the possibility of parole into the death penalty determination improperly diverts the jury's attention from the character of the offender and focuses it upon a speculation that may or may not occur).

While an argument commenting on the possibility of defendant being released and committing future crimes would be improper (see *Gacho*, 122 Ill. 2d at 256-60), in the instant case, the prosecutor did not make such an argument. Here, the prosecutor was merely restating the *Gacho* instruction and asking the jury to consider its meaning.

In *Gacho*, this court held that, in a multiple-murder situation, a jury must be instructed that the only alternative to a death sentence is natural life without the possibility of parole, in order to preclude the jury from concluding that "the death penalty was the only certain way to protect society from this defendant." (*Gacho*, 122 Ill. 2d at 262.) This court further observed:

> "The Unified Code of Corrections provides that, 'No person serving a term of natural life imprisonment may be paroled or released except through executive clemency.' (Ill. Rev. Stat. 1983, ch. 38, par. 1003—3—3(d).) In *California v. Ramos* (1983), 463 U.S. 992, 77 L. Ed. 2d 1171, 103 S. Ct. 3446, the Supreme Court said that to describe a sentence of life imprisonment as without parole 'is simply inaccurate when the governor possesses authority to commute the sentence to a lesser sentence that includes that possibility of parole.' An instruction stating that natural life imprisonment was the only alternative to the death penalty would be defective for failing to include

that a term of life imprisonment may be commuted by the executive." *Gacho*, 122 Ill. 2d at 262.

In *People v. Gosier* (1991), 145 Ill. 2d 127, 160-61, this court reaffirmed its belief that the *Gacho* instruction should include language concerning executive clemency. Therefore, we find no compelling reason for the *Gacho* instruction to be modified where, absent improper argument not found here, the sentencing jury would have no reason to speculate on the possibility of the defendant's release.

The remaining issues raised by defendant are identical to or factually indistinguishable from issues raised by defendant and recently considered by this court on appeal from the defendant's conviction and sentence of death for the murder of John Goodman. (*People v. Page* (1993), 155 Ill. 2d 232.) Therefore, no extended discussion of these issues is warranted in the instant case.

Here, as on appeal in the Goodman murder case, defendant has challenged certain evidence introduced by the State during the eligibility stage of the death penalty hearing as irrelevant and inflammatory. In both cases, details contained in defendant's confessions to the murders of Charles Howell, Andrew Devine, and John Goodman were presented. Defendant argues that this evidence was unnecessary to the jury's consideration of the multiple-murder aggravating circumstance, for which it was offered. However, defendant waived any objection to this evidence where he made no objection at the eligibility stage of the sentencing hearing nor raised this alleged error in his post-trial motion. See *People v. Walker* (1985), 109 Ill. 2d 484, 504.

On the merits, we find, as in the Goodman case, that the evidence now complained of "was merely incidental to properly admitted evidence establishing the defendant's eligibility for the death penalty." (*Page*, 155 Ill. 2d at 276.) However, assuming, *arguendo*, that these details

were erroneously admitted into evidence, we do not believe that it could have had any effect on the jury's determination that defendant was eligible for the death penalty. The evidence at the first stage of the sentencing hearing was not closely balanced, and defendant's eligibility rested on two separate grounds: defendant's commission of murder in the course of armed robbery, and his multiple convictions for murder. Therefore, the introduction of this evidence cannot be considered as plain error. See *Page*, 155 Ill. 2d at 277.

Defendant also contends that the prosecutor, in closing argument at the second stage of the sentencing hearing, improperly diverted the jury's attention from mitigating evidence introduced by defendant. Although defendant failed to raise this matter in his post-trial motion, he urges this court to reach this claim on plain error grounds.

In mitigation at the sentencing hearing, Arlene Messner-Peters, a social worker and death penalty consultant, testified concerning defendant's troubled youth and background. Messner-Peters faulted defendant's parents, the school system and the juvenile court system for failing to provide guidance to defendant and concluded that he was a "product" and "victim" of his environment. In rebuttal argument, the prosecutor commented on this testimony stating: "The Defense wants you to believe that society is at fault for the defendant's acts." The prosecution further argued:

> "[Ms. Messner-Peters] wrote [defendant's] complete life history in less than 40 hours, and she's trying to tell you that he is the victim in this case, he's a victim of society.
>
> * * *
>
> We know who the victims are. The victims are Charles Howell, [Andrew] Devine, and John Goodman. We have three real victims, three real dead bodies. We

have one guy trying to get out from underneath what he did."

In the Goodman murder case, defendant argued on appeal that similar comments by the prosecution that defendant's mitigation was " 'in the category of aggravation and *** [n]othing more and nothing less but plain, simple excuses,' " improperly restricted the jury's consideration of the defense evidence. (*Page*, 155 Ill. 2d at 278.) However, while the sentencing authority in a capital case may not be precluded from considering, or refuse to consider as a matter of law, any relevant mitigating evidence offered by the defense, "[n]othing requires the prosecution *** to agree with the defendant that the evidence offered in his behalf is sufficiently mitigating to preclude imposition of the death sentence, or that it is even mitigating at all." *Page*, 155 Ill. 2d at 279.

Therefore we find that here, as in the Goodman case, "the prosecutor's argument did not restrict or limit the defendant's presentation of mitigating evidence in any way, *** the prosecutor simply discounted the significance of the defendant's mitigation, urging the jury to reject that evidence as grounds for declining to impose the death sentence." (*Page*, 155 Ill. 2d at 280.) For these reasons, we conclude that the prosecutor's argument was not improper and therefore not plain error.

Defendant's final challenge to the prosecutor's closing argument at sentencing concerns remarks which defendant contends improperly diminished the jury's sense of responsibility for the verdict, in violation of the Supreme Court's decision in *Caldwell v. Mississippi* (1985), 472 U.S. 320, 86 L. Ed. 2d 231, 105 S. Ct. 2633. However, when the prosecutor's argument is considered in its totality, it is clear there was no attempt to minimize the jury's responsibility for this decision.

At the outset of closing argument at the second stage of defendant's sentencing hearing, the prosecutor stated:

"Ladies and gentlemen, as you know by now, after sitting through this past week hearing what you heard, plain and simple, Patrick Page is a killer. And that brings us to the question what's to be done with him. What does society, the people of our State, what do you and I do with a person who has done the things that he's done is the question you must answer."

Defendant complains that the last portion of this argument implied that the prosecutor and society shared responsibility with the jury in the decision to impose the death penalty. However, taken in context, it is apparent that the prosecutor's rhetorical question was meant to focus the jury's attention on the task of imposing a sentence on defendant.

Defendant also cites a comment made by the prosecutor during rebuttal argument which referred to an instruction informing the jury that defendant should be sentenced to death if the jury unanimously found that there were no mitigating factors sufficient to preclude its imposition: "What [the instruction is] telling you, ladies and gentlemen of the jury, is that your Legislature has found that this crime of murder—that the appropriate sentence of punishment for that is the death penalty." However, in *Pasch*, this court held that similar comments by the prosecutor as to what the law of this State mandated did not shift the responsibility of death from the jury to another judicial body. *Pasch*, 152 Ill. 2d at 205-06.

Finally, defendant complains of the prosecutor's rebuttal argument that defendant "sentenced himself to death." This argument was in direct response to defense counsel's closing argument which implored the jury not to "kill" defendant. The prosecutor's further response— "He did it, ladies and gentlemen. He did it to himself.

You had nothing to do with it. Those are his acts, and he has to be held accountable and responsible for his actions"—merely pointed out that defendant's own conduct is what necessitated this decision by the jury. This court found that similar remarks made by the prosecutor at sentencing in the Goodman murder case did not violate *Caldwell*, stating:

> "The prosecutor made no attempt to suggest to the jurors that they were relieved of their responsibility by the defendant's own actions. The jury was correctly instructed on its role in the sentencing process, and we do not believe that the jury would have interpreted the prosecutor's comment as contradicting those instructions." (*Page*, 155 Ill. 2d at 281.)

(See also *Pasch*, 152 Ill. 2d at 204-06.) In the instant case, we likewise do not believe that the prosecutor's arguments violated *Caldwell*.

Defendant next argues that the trial court erred in ruling that he was collaterally estopped from litigating the voluntariness of the statement he made regarding Charles Howell's murder because that issue had been determined adversely to defendant by the Will County circuit court during proceedings in the Andrew Devine murder case. Here, as in the Cook County prosecution for the murder of John Goodman, defendant moved to suppress the statements he made while in police custody from May 16 through 20, 1987. And, as in the Goodman case, the State moved to strike defendant's motion, arguing that the same issues had already been determined in a hearing on defendant's motion to suppress his custodial statements in Will County.

After reviewing the transcripts of the Will County suppression hearing, the trial court here, as in the Goodman murder case, granted the State's motion to strike, agreeing with the State that the Will County court had already resolved the admissibility of all defendant's

statements and that he was therefore collaterally estopped from challenging that determination. The trial court noted, however, that should the defense be able to present any change of circumstances it believed sufficient enough to reopen and relitigate the motion, the court would do so.

On direct appeal from defendant's conviction and sentence in the Goodman murder case, this court undertook an extensive discussion of this issue (*Page*, 155 Ill. 2d at 246-59), and concluded that the Will County court, in rejecting defendant's claims, "necessarily determined issues pertinent to all three sets of statements made by the defendant while in police custody." (*Page*, 155 Ill. 2d at 254.) We have carefully examined the record of the Will County proceedings and the record in the instant case and have found nothing to dissuade us from our earlier conclusion "that the Will County judge's ruling on the admissibility of the Devine statements resolved as well factual issues pertinent to the Goodman and Howell statements." *Page*, 155 Ill. 2d at 257.

We likewise find that the trial court herein did not err in failing to conduct a suppression hearing to allow defendant to present additional evidence concerning the treatment he received while in police custody. As in the Goodman case, we do not consider defendant's new allegations "to be an exceptional circumstance that would necessitate a separate hearing." *Page*, 155 Ill. 2d at 258.

Defendant also contends that principles of double jeopardy and collateral estoppel bar imposition of the death penalty in this case where the trial court, acting as sentencer in the Will County prosecution, declined to impose that penalty based upon substantially the same evidence in aggravation and mitigation. However, this same issue was considered and rejected on review in the Goodman murder case, where this court stated as follows:

"The trial judge in the Will County proceeding declined to sentence the defendant to death for the murder of Andrew Devine, concluding that the sentence was not appropriate in that case. The finding that death was inappropriate punishment for the defendant's conviction for that murder means, of course, that the defendant may not later be subject to the death penalty for the same offense. We do not agree with the defendant, however, that the trial judge's ruling can be said to bar imposition of the death penalty in other cases involving different murder convictions. That the same evidence in aggravation and mitigation might be admitted at a subsequent sentencing hearing does not alter our view of the matter." *Page*, 155 Ill. 2d at 273.

We further note that although much of the evidence in aggravation and mitigation presented at the Devine and Howell capital sentencing hearings was similar, there was a significant difference. Although the Will County circuit court heard defendant's confessions to the murders in Cook County of Goodman and Howell, the court stated that it was "going to consider this case, as far as sentencing is concerned, as if [defendant] had been tried and found guilty and been convicted prior to any subsequent homicides that he may be charged with or may have been involved in." The Will County court accordingly found that "Defendant does not have a significant criminal record or history which would require that [he] be sentenced to death for the homicide of Mr. Devine." Thus, where the sentencing body in the instant case considered, in addition to defendant's confessions to the two other murders he had committed, defendant's convictions for those murders, the aggravating evidence was substantially greater than that considered by the Will County court. Therefore, there is no incongruity or arbitrariness in the different sentencing decisions reached in the two cases.

Defendant additionally raises several challenges to the facial validity of the Illinois death penalty statute (Ill. Rev. Stat. 1985, ch. 38, par. 9—1): (1) that the prosecution should not enjoy the benefit of making both opening and rebuttal arguments at the conclusion of the second stage of the sentencing hearing; (2) that the death penalty statute bars the sentencing body from giving meaningful consideration to a defendant's evidence in mitigation; and (3) that various aspects of the death penalty statute invite the arbitrary and capricious imposition of that sentence. This court rejected identical challenges to the statute, however, when defendant raised them on appeal in the Goodman case, and defendant does not offer any persuasive reason that would warrant our reaching a different conclusion herein. See *Page*, 155 Ill. 2d at 282-85.

For the reasons set forth above, the judgment of the circuit court of Cook County is affirmed. We hereby direct the clerk of this court to enter an order setting Tuesday, November 16, 1993, as the date on which the sentence of death, entered by the circuit court of Cook County, is to be carried out. The defendant shall be executed in a manner provided by law (Ill. Rev. Stat. 1991, ch. 38, par. 119—5). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden at Stateville Correctional Center, and the warden of the institution where defendant is now confined.

*Affirmed.*