UNITED STATES of America,

v.

Usama Bin LADEN, a/k/a "Usamah Bin–Muhammad Bin–Ladin," a/k/a "Shaykh Usamah Bin–Ladin," a/k/a "Abu Abdullah," a/k/a "Mujahid Shaykh," a/k/a "Hajj," a/k/a "Abdul Hay," a/k/a "al Qaqa," a/k/a "the Director," a/k/a "the Supervisor," a/k/a "the Contractor," Muhammad Atef, a/k/a "Abu Hafs," a/k/a "Abu Hafs el Masry," a/k/a "Abu Hafs el Masry el Khabir," a/k/a "Taysir," a/k/a "Sheikh Taysir Abdullah," a/k/a "Abu Fatimah," a/k/a "Abu Khadija," Ayman Al Zawahiri, a/k/a "Abdel Muaz," a/k/a "Dr. Ayman al Zawahiri," a/k/a "the Doctor," a/k/a "Nur," a/k/a "Ustaz," a/k/a "Abu Mohammed," a/k/a "Abu Mohammed Nur al-Deen," Mamdouh Mahmud Salim, a/k/a "Abu Hajer al Iraqi," a/k/a "Abu Hajer," Khaled Al Fawwaz, a/k/a "Khaled Abdul Rahman Hamad al Fawwaz," a/k/a "Abu Omar," a/k/a "Hamad," Ali Mohamed, a/k/a "Ali Abdelseoud Mohamed," a/k/a "Abu Omar," a/k/a "Omar," a/k/a "Haydara," a/k/a "Taymour Ali Nasser," a/k/a "Ahmed Bahaa Eldin Mohamed Adam," Wadih El Hage, a/k/a "Abdus Sabbur," a/k/a "Abd al Sabbur," a/k/a "Wadia," a/k/a "Abu Abdullah al Lubnani," a/k/a "Norman," a/k/a "Wa'da Norman," a/k/a "the Manager," a/k/a "Tanzanite," Ibrahim Eidarous, a/k/a "Ibrahim Hussein Abdelhadi Eidarous," a/k/a "Daoud," a/k/a "Abu Abdullah," a/k/a "Ibrahim," Adel Abdel Bary, a/k/a "Adel Mohammed Abdul Almagid Abdel Bary," a/k/a "Abbas," a/k/a "Abu Dia," a/k/a "Adel," Fazul Abdullah Mohammed, a/k/a "Harun," a/k/a "Harun Fazhl," a/k/a "Fazhl Abdullah," a/k/a "Fazhl Khan," Mohamed Sadeek Odeh, a/k/a "Abu Moath," a/k/a "Noureldine," a/k/a "Marwan," a/k/a "Hydar," a/k/a "Abdullbast Awadah," a/k/a "Abdulbasit Awadh Mbarak Assayid," Mohamed Rashed Daoud Al-'Owhali, a/k/a "Khalid Salim Saleh Bin Rashed," a/k/a "Moath," a/k/a "Abdul Jabbar Ali Abdel–Latif," Mustafa Mohamed Fadhil, a/k/a "Mustafa Ali Elbishy," a/k/a "Hussein," a/k/a "Hussein Ali," a/k/a "Khalid," a/k/a "Abu Jihad," Khalfan Khamis Mohamed, a/k/a "Khalfan Khamis," Ahmed Khalfan Ghailani, a/k/a "Fupi," a/k/a "Abubakary Khalfan Ahmed Ghailani," a/k/a "Abubakar Khalfan Ahmed," Fahid Mohammed Ally Msalam, a/k/a "Fahad M. Ally," Sheikh Ahmed Salim Swedan, a/k/a "Sheikh Bahamadi," a/k/a "Ahmed Ally," Defendants.

No. S(7) 98 CR 1023 LBS.

United States District Court,
S.D. New York.

July 23, 2001.

Mary Jo White, United States Attorney for the Southern District of New York, New York City, Patrick J. Fitzgerald,

Kenneth M. Karas, Michael J. Garcia, Paul W. Butler, Assistant United States Attorneys, for U.S.

Sam A. Schmidt, Joshua L. Dratel, Kristian K. Larsen, New York City, for Defendant El–Hage.

Frederick H. Cohn, Laura Gasiorowski, David Preston Baugh, New York City, for Defendant Al-'Owhali.

David Stern, David Ruhnke, New York City, for Defendant Khamis Mohamed.

Anthony L. Ricco, Edward D. Wilford, Carl J. Herman, Sandra A. Babcock, New York City, for Defendant Odeh.

## OPINION [1]

SAND, District Judge.

Defendant Khalfan Khamis Mohamed was convicted by a jury on May 29, 2001 of numerous capital and non-capital offenses arising out of his participation in the August 7, 1998 bombing of the American Embassy in Dar es Salaam, Tanzania. In a notice filed well in advance of trial, the United States Government indicated that it would seek the death penalty for fifteen

of the counts charged in the Indictment. At the conclusion of the trial, it was the intention of the parties and the Court to begin a penalty phase hearing for Khalfan Mohamed a few days after the jury rendered its penalty phase verdict for his co-defendant, Mohamed Rashed Daoud Al-'Owhali.[2]

On May 28, 2001, the day before the jury returned its trial verdict of guilt on all counts for Khalfan Mohamed and his co-defendants, the Constitutional Court of South Africa ("the Constitutional Court") unanimously held that South African officials' delivery of Khalfan Mohamed into the custody of American FBI agents, without securing an assurance that he would not be subject to the death penalty, was a violation of South African constitutional and statutory law. S. Afr. Constitutional Court Transcript of Judgment ("CC Tr. of J.") at 39–40.[3] In light of this decision, Khalfan Mohamed seeks the following relief: (1) that the Court should preclude the Government from further seeking the death penalty against him in this case; or, if the Government is permitted to proceed with its capital case, (2) that Khalfan Mo-

1. On June 12, 2001, after hearing oral argument from the parties, the Court announced a ruling which addressed the impact on the capital case against Khalfan Khamis Mohamed of a decision recently issued by the Constitutional Court of South Africa. (Tr. at 7339–48.) Because the Constitutional Court's decision was rendered only weeks before the penalty phase hearing of Khalfan Mohamed was scheduled to commence, a prompt announcement of this Court's ruling was necessary. At that time, the Court indicated that a formal opinion, addressing the issues more thoroughly, would be filed in due course. (Tr. at 7339.) The following constitutes that opinion.

2. Defendants Al-'Owhali and Mohamed requested a bifurcation or severance of their penalty phase hearings, arguing that they would be "significantly disadvantaged" by a joint hearing. The Court granted their re-

quest on April 23, 2001. (Tr. at 4377.) On June 12, 2001, the same jury that would hear Khalfan Mohamed's case informed the Court that it was unable to reach a unanimous decision as to whether Mohamed Rashed Daoud Al-'Owhali should receive either a life sentence or a sentence of death. The Court, therefore, is scheduled, as specified by statute, to sentence Al-'Owhali to life imprisonment without possibility of release, separately as to each capital count.

3. On June 1, 2001, a full transcript of the judgment of the Constitutional Court was delivered by hand to the Court. The parties eventually submitted to the Court multiple copies of the Constitutional Court's decision, some of which had adjusted margins or line spacing and therefore different pagination. The pages cited herein refer to the official 45–page transcript received by the Court.

hamed should be permitted to introduce as a mitigating factor the decision of the Constitutional Court. For the reasons set forth below, the Court denies the first part of the Defendant's motion and declines to direct the Government to discontinue its capital case against Khalfan Mohamed. As to Mohamed's second request, however, the Court holds that he may present to the jury, as a mitigating factor, the fact that the Constitutional Court has ruled that had the proper procedures been followed by South African authorities, Mohamed's delivery to United States officials would have been conditioned on an assurance that he would not be eligible for the death penalty.

## I. BACKGROUND

### A. The Investigation, Mohamed's Arrest and His Rendition to the United States

On August 7, 1998, at approximately 10:40 a.m., the American Embassy in Dar es Salaam, Tanzania was bombed, killing eleven persons and injuring at least 85 persons. (Ind.¶ 12(bbb).) Approximately ten minutes earlier, the American Embassy in Nairobi, Kenya had also been bombed as part of a coordinated attack allegedly undertaken by members and affiliates of Usama Bin Laden's international terrorist organization, al Qaeda. (Id. ¶ 12(yy).) After the bombings, Khalfan Khamis Mohamed, an admitted participant in the Dar es Salaam bombing plot, fled Tanzania. (Gov't Resp. to KKM Mot. to Suppress (Jan. 23, 2001) at 2.) A week later, on August 16, 1998, after traveling through Mozambique, Mohamed arrived in South Africa. (Id.; KKM Reply (Mot. to Suppress) (Jan. 26, 2001) Ex. A at 1.) Using fraudulent documents bearing the alias "Zairon Nassor Maulid," Mohamed

applied for political asylum in South Africa. (Id.) During the pendency of his asylum application, he was granted a temporary permit and was required to report periodically to the Home Affairs Office in South Africa. (Id.) While in South Africa, Mohamed lived and worked in Cape Town under his assumed name. (Id.)

Meanwhile, warrants for Mohamed's arrest were issued in the Southern District of New York on December 17, 1998 and July 1, 1999. (Ruhnke Decl., KKM Mot. to Suppress (Jan. 11, 2001) at A12.) On August 30, 1999, FBI Special Agent Stephen Gaudin visited the Home Affairs Office in Cape Town and was permitted access to files containing information about applicants for political asylum (including fingerprints and photographs). (Gov't Resp. to KKM Mot. to Suppress, Ex. C ("Terblanche Aff.") at 2–3.) S.A. Gaudin identified the photograph of Khalfan Mohamed and informed Chief Immigration Officer Christo Terblanche that the name being used by Mohamed in his application was not his real name. (Id.) On that basis, Mohamed's name was placed on the "stop list" and a note was placed in the system file to arrest Mohamed as soon as he reported to any Home Affairs Office. On October 5, 1999, when he reported to the Cape Town office to renew his temporary immigration permit, Khalfan Mohamed was arrested by Inspectors from the South African Bureau of Home Affairs for submitting false documents when applying for political asylum.[4] (Ruhnke Decl. ¶ 1.)

Mohamed was initially questioned by South African authorities and was then transferred to a holding cell at the Cape Town International Airport where he was interviewed by American FBI agents. (Id.) During interrogation by American officials on October 5 and 6, 1999, Khalfan

4. An FBI agent was present at Mohamed's arrest. (Terblanche Aff. at 10.)

Mohamed admitted to playing a role in the August 7, 1998 bombing of the American Embassy in Dar es Salaam.[5] (*Id.* ¶ 2.) On the evening of October 6, 1999, at approximately 11:19 p.m., the South African Department of Home Affairs turned Khalfan Mohamed over to the custody of the FBI.[6] (*Id.* at A13.) Mohamed was promptly flown from Cape Town to the United States and, during the flight, FBI agents informed him that he was under arrest pursuant to the aforementioned warrants. (*Id.* at A12.)

Jury selection in Khalfan Mohamed's trial (with three other defendants) before this Court on the charges relating to the Nairobi and Tanzania bombings commenced on January 3, 2001. The trial itself began a month later, on February 5, 2001. As already noted, the jury returned a verdict of guilt as to all defendants on all of the counts on May 29, 2001.

## B. The Litigation in South Africa and the Decision of the Constitutional Court

In November 2000, attorneys for Khalfan Mohamed brought an action in South Africa in the Cape of Good Hope High Court seeking discovery of official documents relating to his case in the United States.[7] CC Tr. of J. at 2 n. 3. The initial complaint was later amended to seek an order " 'directing the Government of the Republic of South Africa to submit a written request through diplomatic channels to the Government of the United States of America, that the death penalty not be sought, imposed nor carried out upon [Mohamed]' should he be convicted in the criminal trial." *Id.* at 4. The applicants asserted as the grounds for this extraordinary remedy that the circumstances surrounding the surrender of Khalfan Mohamed to the United States violated South African law.

On April 20, 2001, the Cape of Good Hope High Court held, in favor of the government respondents, that Khalfan Mohamed's deportation was effectuated in accordance with statutory requirements and was proper in light of his illegal status in the country. *Id.* at 4. Thereafter, Mohamed sought an urgent appeal to the Constitutional Court of South Africa and

5. In a decision issued February 16, 2001, the Court denied Khalfan Mohamed's motion to suppress these statements. *United States v. Bin Laden*, 132 F.Supp.2d 168, 194 (S.D.N.Y. 2001).

6. During separate interviews with agents of South Africa and the United States, Khalfan Mohamed indicated that he would rather be taken to the United States than to Tanzania. (Terblanche Aff. at 6; Ruhnke Decl. at A12.) In fact, Terblanche indicated that "[i]t was in those circumstances that [Mohamed] was handed over to the agents of the FBI who took him to the USA" and was not deported to Tanzania as he would have been in the "ordinary course of events." (Terblanche Aff. at 6.) However, investigation notes recounting the events preceding Mohamed's arrest suggest that the decision to render Mohamed to United States' custody ("either directly or via Tanzania") had been made before his arrest.

(KKM Reply Ex. A. at 3.) In addition, the Constitutional Court reviewed statements made by South African officials during an FBI briefing in New York in September 1999 that reflected an understanding that, once apprehended, Khalfan Mohamed would be brought to trial in the United States. CC Tr. of J. at 8. In light of these somewhat inconsistent accounts, the South African Constitutional Court concluded that "it [cannot] be ascertained with any certainty when—and by whom—the decision was taken on behalf of the South African government to hand Mohamed over to the American government." *Id.* at 9.

7. Abdurahman Dalvie is the second plaintiff or "applicant" in the South African suit. Dalvie employed Khalfan Mohamed and provided him with lodgings during Mohamed's time in Cape Town.

was granted a hearing before that court three weeks later.[8] *Id.* at 5.

The first section of the Constitutional Court's decision, issued on May 28, 2001, examined at some length the legal significance of the distinction between deportation and extradition. *Id.* at 15–24. Recognizing that Mohamed's removal from South Africa could not be characterized as a lawful extradition because none of the requisite extradition procedures had been followed, the lower court had deemed the transfer of custody a deportation. *Id.* at 23. The Constitutional Court explained that the South African government's authority to deport aliens is limited by statute, such that a deportee may be sent only to the country issuing his or her passport or the country of his or her citizenship, nationality, or domicile. *Id.* at 18. Under those guidelines, the Constitutional Court found that the "deportation" of Khalfan Mohamed to the United States was in violation of the statute. *Id.* at 24–25.

Beyond the statutory violations, the court found that the South African officials involved violated Khalfan Mohamed's fundamental rights under the South African constitution. For the purpose of addressing the constitutional question, the court found the distinction between extradition and deportation to be irrelevant and concluded that, whatever it was termed, Khalfan Mohamed's removal to the United States should have been conditioned on a commitment by the United States not to seek or impose the death penalty. *Id.* at 27. The Constitutional Court rejected the South African government's argument that Mohamed had consented to his transfer because it found that he was not adequately apprised of the nature and extent of the constitutional rights he was allegedly waiving. *Id.* at 36–39.

Contrary to the conclusion by the lower court that the relief sought by Khalfan Mohamed would be futile and a decision in his favor therefore unnecessary, the Constitutional Court determined that it was important to resolve the "important issues of legality and policy involved" in the case, "quite apart from the particular interests of the applicants." *Id.* at 40. With respect to the effect of the decision on Mohamed, the court directed that "the full text of this judgment . . . be drawn to the attention of and . . . be delivered to the Director or equivalent administrative head of the General Court for the Southern District of New York as a matter of urgency." [9] *Id.* at 44. As noted, the opinion was so delivered to this Court on June 1, 2001.

## II. THE GOVERNMENT'S CAPITAL CASE AGAINST KHALFAN MOHAMED

In his submission, Khalfan Mohamed argues that there are several reasons—all derivative of the Constitutional Court's decision—why this Court should not permit the Government to pursue the death penalty against him. At the outset, he asserts that imposition of the death penalty under these circumstances would be a violation of international law. (KKM Mot. at 3–6.) As he concedes, the argument that "international law completely bars this nation's use of the death penalty" has already been considered and rejected by the Court.

---

8. The Constitutional Court noted at the outset of its opinion that because Khalfan Mohamed represented that the relief sought in those proceedings "could have a bearing" on his trial before this Court, "the preliminary steps for a hearing . . . were foreshortened." *Id.* at 1.

9. This was not the precise relief sought by the Defendant because the Constitutional Court did not order the executive branch of the South African government to pursue a diplomatic remedy. *Id.* at 40–42.

*United States v. Bin Laden,* 126 F.Supp.2d 290, 294 (S.D.N.Y.2001). The decision of the Constitutional Court, while clarifying South African law with respect to the extradition or deportation of persons to countries which have the death penalty, does nothing to disturb the Court's earlier ruling permitting the Government to seek the death penalty. Thus, the Court declines to reconsider that decision.

█ It is true that the Constitutional Court held that the circumstances of Khalfan Mohamed's removal violated South African constitutional and statutory law. This Court, while, of course, accepting the decision of the Constitutional Court as the definitive statement of South African law, has an obligation to enforce the laws of this country. As a matter of United States law, Mohamed's argument that the Court should preclude the Government from seeking the death penalty in his case because "the Government conspired with South African immigration officials to arrange an unlawful deportation" (KKM Mot. at 4–5) is flawed for several reasons.

Mohamed's version of events, which suggests an informed effort by American officials to circumvent established South African law, does not comport with the facts. The decision issued by the Constitutional Court (which reversed a lower court ruling) clarifies an area of law that prior to that decision—and at the time of Mohamed's arrest—could reasonably be perceived by American officials as unsettled. (*See* Gov't Resp. at 4.) Even the extradition treaty in force at the time of the arrest and deportation of Khalfan Mohamed did not allow the South African government to condition Mohamed's extradition on a guarantee that the death penalty would not be sought. Treaty of Extradition, December 18, 1947, U.S.-S. Afr., 2 U.S.T. 884.[10] In the view of the Court, when Khalfan Mohamed was released into their custody, it was reasonable for American agents to rely on the South African officials' interpretation of South African law. *See United States v. Lira,* 515 F.2d 68, 71–72 (2d Cir.1975) ("[I]n dealing with a foreign government, the [American]

---

**10.** Just prior to Mohamed's arrest, the United States had signed but not yet ratified a new extradition treaty with South Africa which does provide that "the Requested State may refuse extradition unless the Requesting State provides assurances that the death penalty will not be imposed, or if imposed, will not be carried out." Extradition Treaty Between the Government of the United States and the Government of the Republic of South Africa, September 16, 1999, U.S.S.Afr. That treaty, which also provides that a fugitive who consents may be transferred without formal extradition proceedings, is still not in force. *See Extradition Treaties Recently Signed, Approved for Ratification and/or entered into Force,* Int'l Enforcement Law Rep., May 2001, Vol. 17, No. 5, Sect. X (indicating that as of April 4, 2001, the treaty had not yet been ratified by the Senate).

Given that, at the time of Khalfan Mohamed's arrest, there was no provision in the extant extradition treaty for South African officials to demand an assurance that the

death penalty would not be sought, it is interesting to consider how they might have complied with the subsequent ruling of the Constitutional Court. The Constitutional Court indicated that "[i]f the South African authorities had sought an assurance from the United States against the death sentence being imposed on Mohamed before handing him over to the FBI, there is no reason to believe that such an assurance would not have been given." CC Tr. of J. at 30. Although in this type of situation (where the treaty is silent on the issue) a foreign government in South Africa's position would not technically have the right to demand such an assurance as a condition of extradition, the United States has, on occasion, acceded to such a request. *See Federal Death Penalty Legislation: Hearings on H.R. 2102, 2709, 3119, 3238, 3342, 3539, 3871, 3918 and 4002 Before the House Comm. on the Judiciary,* 101st Cong. 356 (1990) (statement of Alan J. Kreczko, Deputy Legal Adviser, U.S. Department of State).

agents were entitled to rely on that government's interpretation and enforcement of its own laws."). At the time, there was no objection voiced by the South African government to Mohamed's rendition to the United States. *Cf. Davis v. Muellar,* 643 F.2d 521, 526 (8th Cir.1981) (explaining that the court may have reacted differently to a prompt objection to extradition than it did to a delayed, post-surrender claim). For these reasons, it is the Court's belief that the American officials involved in Mohamed's arrest and extradition acted in good faith.[11]

 Ultimately, though, regardless of the motives of American officials or the degree of their involvement in orchestrating his arrest and removal from South Africa, the remedy Khalfan Mohamed seeks under these circumstances would be unwarranted. Both the Defendant and the Government point out (*see* KKM Mot. at 7; Gov't Resp. at 1) that, as a general rule, the manner by which a defendant is brought before a court does not affect that court's proper assertion of jurisdiction in criminal cases. *See Ker v. Illinois,* 119 U.S. 436, 444, 7 S.Ct. 225, 30 L.Ed. 421 (1886); *Frisbie v. Collins,* 342 U.S. 519, 522, 72 S.Ct. 509, 96 L.Ed. 541 (1952) ("[D]ue process of law is satisfied when one present in court is convicted of crime after having been fairly apprized of the charges against him and after a fair trial in accordance with constitutional procedural safeguards. There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will."). In *United States v. Alvarez–Machain,* 504 U.S. 655, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992), the Supreme Court considered the case of a defendant whose kidnaping from Mexico was overseen by American DEA officials. In addition to noting that there was no express prohibition on forcible abductions in the United States' extradition treaty with Mexico, the *Alvarez–Machain* Court highlighted that there was no provision in the treaty that formal extradition was the sole means of transferring or acquiring custody of a suspected criminal. *Id.* at 664–66, 112 S.Ct. 2188. The same is true of the bilateral treaty governing extraditions between South Africa and the United States at the time of Khalfan Mohamed's arrest and removal. Treaty of Extradition, December 18, 1947, U.S.-S. Afr., 2 U.S.T. 884. There is no provision in the treaty that expressly prohibits the procedures followed in this case and no statement that the procedures outlined in the treaty were the sole means of transferring custody of a suspected criminal. *Id.* In the absence of a treaty violation, the *Ker/Frisbie* doctrine controls and Mohamed is not entitled to the relief he seeks. *See Alvarez–Machain,* 504 U.S. at 669–70, 112 S.Ct. 2188.

The Second Circuit case most often cited as the exception to the *Ker/Frisbie* and *Alvarez–Machain* line of decisions, *United States v. Toscanino,* 500 F.2d 267 (2d Cir.

---

**11.** Even if the Court were to conclude that the South African officials acted deliberately to violate South African law, the fact that American agents were active participants in the arrest and extradition of Khalfan Mohamed—that, in the Defendant's words "the two countries worked hand-in-glove"—would not be dispositive. The participation of the American agents in seeking the arrest and transfer of custody of Khalfan Mohamed does not make them liable for the South African officials' failure to effectuate the extradition or deportation in accordance with South African law. *See United States v. Yousef,* 925 F.Supp. 1063, 1076 (S.D.N.Y.1996) ("The courts in this circuit have long recognized that United States law enforcement agencies cannot be held responsible for the manner in which foreign governments act in extradition or expulsion proceedings of someone in their custody.").

1974), held that "due process ... requir[es] a court to divest itself of jurisdiction over the person of a defendant where it has been acquired as the result of the government's deliberate, unnecessary and unreasonable invasion of the accused's constitutional rights." *Id.* at 275. The conduct alleged by Khalfan Mohamed, however, does not even approach the type of shocking or outrageous government conduct required by *Toscanino* and its progeny. *See U.S. ex rel. Lujan v. Gengler,* 510 F.2d 62, 65 (2d Cir.1975) (explaining that mere illegality in the process which results in a defendant being brought before a federal court would *not* be sufficient to "vitiate the proceedings of the criminal court"); *United States v. Romano,* 706 F.2d 370, 373 (2d Cir.1983) (same). The Court's jurisdiction over the Defendant is, therefore, proper.

■ Anticipating that conclusion, Mohamed asserts that because this is a capital case and because the remedy sought is not the divestment by this Court of jurisdiction but a ruling forbidding the United States from seeking the death penalty, the aforementioned cases do not control. (KKM Mot. at 7–8.) The sole basis for this contention seems to be the notion that the death penalty is "different." *(Id.)* (citing *Harris v. Alabama,* 513 U.S. 504, 516 n. 1, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995) (Stevens, J., dissenting); *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Gardner v. Florida,* 430 U.S. 349, 357–58, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977).) The Court does not take issue with the assertion that a death sentence is qualitatively different from a sentence of life imprisonment. Recognition of that principle, however, does not provide a justification for the type of remedy suggested by the Defendant. In a case where the Court has identified no unlawful—nor even questionable—conduct on the part of American officials, a court order directing the Government not to seek the death penalty would be unwarranted and ill-advised. This Court is not free to exercise an independent judgment as to the appropriateness of seeking the death penalty under these circumstances.

Insofar as the decision of the Constitutional Court of South Africa is addressed to matters of diplomacy, of foreign policy or of the exercise of executive discretion, those are matters to be addressed by other branches of the government. Indeed, in light of the May 28, 2001 decision of the Constitutional Court and the June 12, 2001 verdict rendered by the jury in the Al-'Owhali penalty phase, the attorneys for Khalfan Mohamed submitted a request to the Attorney General's Capital Review Committee to "de-authorize the case of Khalfan Khamis Mohamed as a capital matter" and also forwarded that committee, among other documents, a copy of the Constitutional Court's decision. (Letter from Ruhnke to The Attorney General's Review Committee on Capital Cases of June 13, 2001, at 1.) On June 18, 2001, the Government informed the Court that the Department of Justice had indicated that the authorization would not be withdrawn. (Tr. at 7354.).

■ Finally, Mohamed asserts that the fact that he "faces capital punishment only because he was handed over to United States officials in violation of South African law would render any death sentence arbitrary and capricious." (KKM Mot at 7.) The Court rejects the suggestion that it should, on the basis of the decision of the Constitutional Court, pronounce that any death sentence imposed on Khalfan Mohamed would be arbitrary and capricious. Instead, as outlined below, the Court will permit the jury to consider the Constitu-

tional Court's decision as a mitigating factor.

## III. THE CONSTITUTIONAL COURT'S DECISION AS A MITIGATING FACTOR

Khalfan Mohamed's alternate argument is that he should be permitted to introduce the decision of the Constitutional Court as a mitigating factor during his penalty phase hearing because it demonstrates that his "exposure to the death penalty" was the product of "happenstance." (KKM Mot. at 9.) The Government objects on the ground that the failure of South African officials to secure an assurance from United States officials that the death penalty would not be sought against or imposed on Khalfan Mohamed is unrelated to Mohamed's background or character and has nothing to do with the bombings. (Gov't Resp. at 6.)

■ Mohamed's right, as a capital defendant, to present mitigating factors to the jury during the penalty phase hearing is firmly established. *See Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). Using language that would later be incorporated into the catchall definitions of mitigators in the federal death penalty statutes, the Supreme Court held in *Lockett* that:

> the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

438 U.S. at 604, 98 S.Ct. 2954. *Lockett* and the Court's subsequent rulings on mitigating factors were intended to ensure that capital defendants would be viewed by juries as individuals and sentenced accordingly. *See, e.g., Penry v. Lynaugh,* 492 U.S. 302, 327–28, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (suggesting that a mitigating factor should be closely linked to the "personal culpability" of the defendant).

At the same time, the Supreme Court emphasized that the purpose of channeling and limiting juror discretion in death penalty cases through the use of aggravating and mitigating factors was to provide a "meaningful basis for distinguishing" between cases in which the death penalty is imposed and "the many cases in which it is not." *Gregg v. Georgia,* 428 U.S. 153, 188–89, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (quoting from *Furman v. Georgia,* 408 U.S. 238, 313, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (White, J., concurring)). The *Gregg* Court sought to ensure that the discretion of the sentencing body would be "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Id.* at 189, 96 S.Ct. 2909. *Cf. Enmund v. Florida,* 458 U.S. 782, 798, 823, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) (discussing proportionality in capital sentencing and the importance of considering relative culpability).

These precedents are reflected in the legislative scheme. The statute under which the Government is seeking the death penalty against Khalfan Mohamed, 18 U.S.C. §§ 3591–3598, enumerates seven specific categories of mitigating factors. 18 U.S.C. § 3592(a)(1)-(7). Briefly, those factors are: (1) the defendant's impaired capacity; (2) that the defendant acted under duress; (3) that the defendant's participation was minor; (4) that other, equally culpable defendants will not be punished by death; (5) the lack of a prior criminal record; (6) that the defendant acted under severe mental or emotional disturbance; and (7) the victim's consent. *Id.* The eighth

and final provision under § 3592(a) allows for "[o]ther factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence" to be considered by the jury. 18 U.S.C. § 3592(a)(8).

It is immediately apparent that the mitigating factor proposed by Khalfan Mohamed does not fit any of the listed categories. In the Government's view, the decision of the South Africa Constitutional Court also does not fall within the catch-all provision, § 3592(a)(8), because it does not directly relate to the defendant's background or character or to a circumstance of the offense. (Gov't Resp. at 5–7.) Given the limiting language of 18 U.S.C. § 3592(a)(8), the Government's narrow reading does not, at first glance, appear unreasonable.

■ However, the Government's position is difficult to reconcile with the fourth statutory mitigating factor, that "another defendant or defendants, equally culpable in the crime, will not be punished by death." 18 U.S.C. § 3592(a)(4). Congress' deliberate inclusion of this factor in the legislative scheme [12] calls for a more broad interpretation of the range of permissible nonstatutory mitigating factors than the Government suggests. The circumstance that others who are equally culpable will not be subject to the death penalty is a comparative factor which reflects a determination by Congress that it is appropriate for jurors to consider questions of proportionality and equity when they are evaluating whether a death sentence is appropriate. *See United States v. Beckford,* 962 F.Supp. 804, 811–16 (E.D.Va.1997) (analyzing 21 U.S.C. § 848(m)(8)) (explaining that "proportionality, equity, and fairness" are the goals "which underlie" the mitigating factor regarding equally culpable defendants). By permitting them to engage in such a comparison, Congress provided jurors with a means of improving the likelihood that the death penalty would not be administered in an arbitrary or random manner. *Cf. Pulley v. Harris,* 465 U.S. 37, 45, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984) (noting that general comparative proportionality review provides an "additional safeguard against arbitrary or capricious sentencing"). With these goals thus incorporated into the stat-

**12.** A review of competing draft versions of the death penalty legislation makes clear that the decision to include this factor was contested. *Compare, e.g.,* S. 32, 101st Cong. § 3592(a)(8) (1989); H.R. 2102, 101st Cong. § 2(c)(1)(H) (1989) *and* H.R. 3119, 101st Cong. § 3592(a)(8) (which include the equally culpable defendants mitigator) *with* S. 1225, 101st Cong. § 3592(a) (1989); H.R. 2709, 101st Cong. § 3592(a) (1989) *and* H.R. 3918, 101st Cong. § 3592(a) (1990) (which do not). One opponent of this mitigating factor expressed concern that "the fact that some of the killers have avoided the full measure of just punishment for such reasons does not justify undeserved leniency towards the other participants." *See Federal Death Penalty Legislation: Hearings on H.R. 2102, 2709, 3119, 3238, 3342, 3539, 3871, 3918 and 4002 Before the House Comm. on the Judiciary,* 101st Cong. 291, 300–01 (1990) (prepared state-

ment of Edward Dennis, Jr., Assistant Attorney General). Others challenged that inclusion of the factor might prevent "a second jury" from "impos[ing] a death sentence on a second defendant based on aggravating circumstances that were present in a second defendant's case that were not present in the first defendant's case." *See* H.R.Rep. No. 103–467 (1994) (dissenting views) (discussing the Gekas amendment). Also, inclusion of the factor was not constitutionally required. *Cf. Pulley v. Harris,* 465 U.S. 37, 45, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984) (holding that general comparative proportionality review is not constitutionally required). *See also People v. Page,* 156 Ill.2d 258, 270, 189 Ill.Dec. 371, 620 N.E.2d 339 (1993); *State v. Koskovich,* 168 N.J. 448, 538, 776 A.2d 144, 202 (2001). Nevertheless, the factor was included in the list of mitigating factors that appears in the statute today.

ute, it would be inappropriate for the Court to adopt the strict reading of the catchall mitigator that is advocated by the Government. *Cf. United States v. Davis,* 132 F.Supp.2d 455, 464 (E.D.La.2001) (concluding that the structure and language of 18 U.S.C. § 3592 suggests a broad definition of relevant mitigating factors, in part because the catchall mitigator "is a subcategory of 'any mitigating factor' rather than being the outer boundaries of what may be considered as mitigating"); *United States v. Cooper,* 91 F.Supp.2d 90, 101 (D.D.C.2000) (explaining that § 3592 "clearly states that the enumerated factors are not exclusive and any mitigating factor may be considered by the jury").

The decision to permit Khalfan Mohamed to present the decision of the Constitutional Court as a mitigating factor is largely informed by the particular facts of this case. Under the terms of his extradition from Germany, Defendant Mamdouh Mahmud Salim does not face the death penalty. Likewise, it is anticipated that three defendants whose extradition from the United Kingdom is pending, Khalid al Fawwaz, Ibrahim Eidarous, and Adel Abdel Bary, will also not be eligible for the death penalty.[13] During the penalty phase, Khalfan Mohamed may point to these defendants and explain to the jury that because of the laws of the countries of their arrest and the terms of the relevant extradition treaties, these otherwise possibly eligible defendants are not facing the death penalty.[14] It would seem odd, then, to say that Mohamed cannot point to a specific (and not overly speculative) set of circumstances regarding his own arrest and removal to the United States and argue to the jury that if things had gone as the South African Constitutional Court says they should have, he too would not be eligible for the death penalty. In Mohamed's view, the fact that some other defendants do not face the death penalty "because the nation in which they were arrested properly applied its law, while South Africa did not, is something that belongs in the mix of information as relevant mitigating evidence that a jury should weigh and balance in reaching its ultimate conclusion." (KKM Mot. at 7.) The Government's contention, that the jury should not be permitted to show leniency toward a defendant because of such "geographic happenstance," while unavailing to defeat Mohamed's application to list this circumstance as a mitigator, is a perfectly legitimate rebuttal argument.[15] Because of its similarity to the statutory mitigating factor regarding equally culpable defendants (and because it actually bears a more direct relationship to the personal circumstances of the defendant than the statutory factor

**13.** This information—about Salim, al Fawwaz, Eidarous and Abdel Bary—was presented to the jury in KKM Ex. Stip. 6.

**14.** Of course, Khalfan Mohamed can also point to additional defendants who do not face the death penalty for a host of other reasons, including Mohamed Al-'Owhali, Wadih El–Hage, Mohamed Odeh, and Ali Mohamed, among others. The Court has focused on Salim, al Fawwaz, Eidarous and Abdel Bary because of the circumstances of their extradition.

**15.** In fact, at least one survey of capital jurors suggests that these types of equity arguments, made on behalf of capital defendants, are not necessarily persuasive. *See* Stephen Garvey, *Aggravation and Mitigation in Capital Cases: What do Jurors Think?,* 98 Colum. L.Rev. 1538, 1566 (1998) ("Although 17.2% said they would be less likely to vote for death if the defendant's accomplice received lesser punishment in exchange for testimony against the defendant, slightly over two-thirds said they would be just as likely to impose death under such circumstances. Jurors perhaps take the view that the defendant should not escape the full measure of punishment just because his codefendant did.").

does), Khalfan Mohamed may present a focused summary of the holding (not the full text of the decision) of the South African Constitutional Court to the jury as a mitigating factor during his penalty hearing.

## IV. ADDENDUM

The penalty phase hearing for Khalfan Khamis Mohamed commenced on June 19, 2001. On July 2, 2001, Mohamed introduced KKM Ex. Stip. 12 which was a stipulation with the Government that provided, in pertinent part:

> Khalfan Khamis Mohamed traveled to South Africa in August 1998. Tanzania has the death penalty, South Africa does not. When he was arrested in South Africa in October 1999, Khalfan Khamis Mohamed was surrendered to U.S. authorities. The South African authorities did not seek or obtain assurances that the U.S. would not seek the death penalty. In May 2001, the highest Court of the Republic of South Africa, overruling a lower court decision, held that Khalfan Khamis Mohamed should not have been released to American authorities by South African immigration officials without obtaining an agreement from the United States that he would not face the death penalty in the United States. In its decision, the Court was not critical of the actions of any American officials.

In the penalty phase charge and special verdict form, the jury was informed that the mitigating factor listed as letter "k" was one of two "undisputed matters of law" which the jury was "to consider during the weighing process." Mitigating factor "k" read as follows:

> As a matter of South African law, Khalfan Mohamed should not have been released to American officials without assurances that he would not face the death penalty in the United States.

(KKM Penalty Phase Charge at 23; KKM Penalty Phase Special Verdict Form at 12.)

On July 10, 2001, after deliberating for approximately two days, the jury informed the Court that they were "unable to reach a unanimous verdict either in favor of a life sentence or in favor of a death sentence, for any of the capital counts" and indicated that they understood "that the consequence of this is that Khalfan Khamis Mohamed will be sentenced to life imprisonment without the possibility of release." (KKM Special Verdict Form at 17.) On the special verdict form, the jury indicated that 11 jurors found that "[o]thers of equal or greater culpability in the murders will not be sentenced to death." (KKM Penalty Phase Special Verdict Form at 13.) There is no way to gauge the significance that the jury attached either to that factor or to the decision of the Constitutional Court during the weighing process.

As a result of the jury's failure to reach a unanimous decision, the Court is scheduled to sentence Khalfan Khamis Mohamed to life imprisonment without possibility of release, separately as to each capital count.

## V. CONCLUSION

For the foregoing reasons, Khalfan Khamis Mohamed's request that the Court direct the Government to discontinue its capital case against him is denied and his request that he be permitted to present the decision of the Constitutional Court of South Africa as a mitigating factor is granted to the extent set forth above.

SO ORDERED